314 Ga. 238
FINAL COPY

S22A0092.  HARRIS v. THE STATE.

NAHMIAS, Chief Justice.

At 9:26 a.m. on June 18, 2014, Appellant Justin Ross Harris closed the door of his Hyundai Tucson SUV and walked into work. His 22-month-old son Cooper, whom Appellant was supposed to have dropped off at a day care center as usual on the way to work that morning, was strapped into a rear-facing car seat in the back seat. After hours in the hot car, Cooper died of hyperthermia.

What was going through Appellant's mind when he left the vehicle? The State's theory was that Appellant intentionally and maliciously abandoned his child to die a slow and painful death trapped in the summer heat, so that Appellant could achieve his dream of being free to further his sexual relationships with women he met online. The defense theory was that Appellant was a loving father who had never mistreated Cooper and simply but tragically

forgot that he had not dropped off the child on that particular morning. During Appellant's trial, substantial evidence was presented to support both theories.

But the State also presented a substantial amount of evidence to lead the jury to answer a different and more legally problematic question: what kind of man is Appellant? Through extensive evidence about Appellant's extramarital sexual relationships — which included sending graphic sexual messages and pictures to multiple women, including minors, and hiring a prostitute — the State convincingly demonstrated that Appellant was a philanderer, a pervert, and even a sexual predator. This evidence did little if anything to answer the key question of Appellant's intent when he walked away from Cooper, but it was likely to lead the jurors to conclude that Appellant was the kind of man who would engage in other morally repulsive conduct (like leaving his child to die painfully in a hot car) and who deserved punishment, even if the jurors were not convinced beyond a reasonable doubt that he purposefully killed Cooper.

As explained below, although the evidence presented at Appellant's trial was legally sufficient to support his convictions for the crimes against Cooper, and some of the evidence regarding Appellant's sexual activities was properly admissible as intrinsic evidence of those crimes or to establish the State's motive theory, the trial court should have excluded much of this evidence under OCGA § 24-4-403 because it was needlessly cumulative and prejudicial, including three categories of highly prejudicial evidence: the evidence that Appellant exchanged lewd and sometimes illegal sexual messages and pictures with four minors; the nine color pictures of Appellant's erect penis that the State extracted from messages and blew up to full-page size as separate exhibits; and the evidence that Appellant hired a prostitute three times. Moreover, because the trial court denied Appellant's motion to sever the trial of three counts of the indictment alleging sexual crimes Appellant committed against one of the minors, C. D., based on the court's erroneous determination that all of the sexual evidence was admissible with respect to the counts alleging crimes against

3

Cooper, the court also erred in denying severance. The trial court's interrelated errors in trying all of the counts together and admitting all of the sexual evidence resulted in the presentation to the jury of substantial and compelling evidence establishing Appellant's sexual deviance, including his commission of additional sexual crimes.

Because the properly admitted evidence that Appellant maliciously and intentionally left Cooper to die was far from overwhelming, we cannot say that it is highly probable that the erroneously admitted sexual evidence did not contribute to the jury's guilty verdicts. We therefore reverse Appellant's convictions on the counts charging crimes against Cooper. Because the State may elect to try Appellant again on those charges, we also address several issues that may recur if there is a retrial. Appellant does not challenge his convictions for the sexual crimes he committed against C. D., as to which there was overwhelming evidence, and so we affirm the judgment as to those three counts.[1]

---

[1] The crimes against C. D. occurred between March 1 and June 18, 2014; Cooper died on June 18, 2014. In September 2014, a Cobb County grand jury

4

1. *The evidence presented at trial*

The evidence presented at Appellant's trial showed the following.[2] In June 2014, Appellant, who was then 33 years old, had been married to Leanna Harris for eight years,[3] and they had one son, Cooper, who was 22 months old. Appellant worked as a web

---

indicted Appellant for five alleged crimes against Cooper (malice murder, two counts of felony murder, and cruelty to children in the first degree and second degree) and three alleged crimes against C. D. (attempt to commit sexual exploitation of a child and two counts of dissemination of harmful material to a minor). After difficulty striking an impartial jury in Cobb County, Appellant's trial was moved to Glynn County, where he was tried beginning on September 12, 2016. After nine and a half days of jury selection, opening statements began on October 3, and closing arguments were on November 7. After almost three and a half days of deliberation, the jury found Appellant guilty of all charges on November 14. On December 5, 2016, the trial court sentenced him to serve life in prison without parole for malice murder and consecutive sentences of 20 years for first-degree child cruelty, 10 years for attempt to commit sexual exploitation of a child, and one year for each count of dissemination of harmful material to a minor. The court vacated the felony murder counts and merged the second-degree child-cruelty count into the first-degree child-cruelty count. Appellant then filed a timely motion for new trial, which he amended in December 2020 with new counsel. In May 2021, after two evidentiary hearings, the trial court denied Appellant's motion, and he then filed a timely notice of appeal. The case was docketed to the term of this Court beginning in December 2021 and orally argued on January 18, 2022.

[2] Because this case requires a careful assessment of whether errors by the trial court were harmful and require reversal, we recount the evidence in considerable detail and not only in the light most favorable to the jury's verdicts. See *Strong v. State*, 309 Ga. 295, 295 n.2 (845 SE2d 653) (2020).

[3] By the time of trial, Leanna had divorced Appellant and changed her last name.

5

developer for Home Depot in one of its corporate office buildings in Cobb County.

(a) *The night before Cooper's death*

At 7:11 p.m. on June 17, Appellant sent Google chat messages to his friends Winston Milling, Alex Hall, and Jason Abdo, asking if they wanted to go to a movie the next day; by 9:47 p.m., Appellant, Milling, and Hall had made plans to see a movie at 5:00 p.m. at the theater near their Home Depot offices.[4] At 7:47 p.m., Appellant searched the Sandals vacation website for trips for two adults and no children.[5]

---

[4] Milling and Hall worked with Appellant at Home Depot, although in a building across the street from Appellant's; Abdo had recently left Home Depot. Appellant was also beginning a side business with the three men doing web development. Message records admitted at trial showed that since April 7, 2014, the four men had communicated with each other almost every day through a Google group chat. Milling testified that it would be more common for him or Hall to suggest going to a movie, but it was not out of the ordinary for Appellant to make the suggestion. When deciding on the time for the movie, Hall suggested 5:00 or 7:35 p.m., Milling replied, "I am fine with 5:00 PM," and then Appellant replied, "5pm would be the best."

[5] Leanna testified that on May 6, Appellant had proposed going on a vacation with Abdo and Abdo's girlfriend and without Cooper. Detective Phil Stoddard testified that on June 17, Appellant looked at websites for vacation destinations like Sandals Bahamas, which do not allow children.

Extensive evidence at trial showed that Appellant regularly communicated online with young women and girls about sexual topics.[6] The early morning hours of June 18 were no exception. At 12:14 a.m., Appellant sent a message, the content of which was not preserved in the message record, to C. D., a girl who was then 17 years old.[7] Also at 12:14 a.m., Elizabeth Smith, a 21-year-old woman with whom Appellant had been communicating since January 2014, sent him a screenshot that is unreadable in the record. Appellant responded less than a minute later, and they started discussing their previous sexual encounter; their conversation ended at 12:44 a.m.[8]

---

[6] Appellant began communicating with a few of these women on a dating website and many others through an online application called "Whisper." Whisper's custodian of records explained that, using the app, "users can interact with one another" by posting and responding to "user-generated content." Appellant's electronic records show that he was a frequent user of Whisper, responding to many posts in a day, some sexual, some not sexual. Whisper and other messages are quoted in this opinion with brackets to clarify language but without correction of spelling or grammar.

[7] Appellant began communicating with C. D. in the fall of 2013, when she was 16. Appellant's communications with C. D. are further detailed in Division 1 (k) below.

[8] Smith testified that her online conversations with Appellant were often sexual. In February 2014, she met Appellant in a parking lot, and they had sex

At 12:40 a.m., Appellant e-mailed a co-worker saying that he could not solve a problem on a project and asking the co-worker to help him the next day at work. At trial, the co-worker explained that Appellant was behind on this project, was dodging check-in calls about it, and had promised to finish it by June 17.[9]

Leanna testified that around this time in June, she and Appellant were also planning a family vacation. Appellant had recently talked to a travel agent about arranging a cruise for him, Leanna, Cooper, his brother, his sister-in-law, and their children. At 12:48 a.m., Appellant did a Google search for child passport fees.

---

in his vehicle. They met again in a parking lot in April 2014 and kissed. Appellant told Smith that he was having "problems in the bedroom" with his wife, but he never said anything about leaving Leanna. Appellant also sent Smith pictures of himself and Cooper when they went to a Braves game on April 25. On June 15, Appellant sent Smith a picture of his erect penis. Appellant's messages with Smith beginning on January 19, 2014, were admitted into evidence at trial, although the record does not show Smith's responses until March 20. This message record includes a thumbnail-size version of the picture of Appellant's penis that he sent; a full-page version of this penis picture was also admitted as a separate exhibit.

[9] The co-worker testified that Appellant seemed "kind of stressed" about the project, and another co-worker testified that in the weeks before Cooper's death, Appellant "seemed a little distant, . . . a little stressed out." Milling and Hall, however, testified that Appellant did not seem stressed on or around June 18.

(b) *The morning of Cooper's death*

According to Appellant,[10] Cooper woke up around 5:15 a.m. Appellant brought Cooper into his and Leanna's bed, and eventually Cooper fell back to sleep. Between 5:46 and 5:49 a.m., Appellant sent more messages to women online. He sent a message to Jaynie Meadows, saying "Morning"; she did not respond.[11] Smith sent a

---

[10] As detailed further below, Appellant spoke to Detective Stoddard and another Cobb County detective in a video-recorded interview at the police station that began about two hours after Cooper's death was discovered on June 18. The interview was played for the jury. After that interview, Appellant was allowed to see and speak to Leanna in an interview room, and he gave an account of the day that was consistent with what he told Detective Stoddard. That conversation was also video recorded and played for the jury. Appellant did not testify at trial.

[11] Meadows testified that she started communicating with Appellant in May 2013, when she was 18 years old. They talked online and on the phone sometimes, having sexual and non-sexual conversations. Eventually, both of them expressed feelings of love. In August 2013, after Meadows told Appellant where she was going to be one day, he unexpectedly showed up, and they kissed. They did not meet in person again, but they continued to talk and express their love for each other. Appellant told her that he was having problems in his marriage and that "if his situation was different he would be with [Meadows] instead of [Leanna]." He also talked about how much he loved Cooper and said that if it were not for Cooper, he would leave Leanna. Appellant told Meadows that he "wanted to be with Cooper for everything he did" and that "Cooper was his life." Meadows also testified that Appellant once complained about a particularly bad bowel movement Cooper had and that on another occasion Appellant "might have gotten" "irritated" about having to stay home with Cooper. Sometimes Meadows could hear Cooper "babbling" in the background when she talked on the phone to Appellant while he was driving. At times during their relationship, including in March and May 2014,

9

message saying that she was "horny" and wanted to give oral sex, and less than 30 seconds later Appellant responded, "Did you suck some dick?" Appellant also sent a message to Caitlin Floyd saying, "Good morning."[12]

Leanna testified that she left home for work at about 7:15 a.m. That morning, like most mornings, Appellant was responsible for dropping off Cooper at Little Apron Academy, Home Depot's in-

_____

Meadows would stop responding to Appellant's messages, which would upset him. On June 15, 2014, after having a brief conversation about Appellant's air conditioning being out, Meadows did not respond to his last message. On the morning of June 17, Appellant sent her messages that said, "Well you're gone again," and "That makes me sad." She did not respond. A record of their messages beginning on December 9, 2013, with only Appellant's messages until April 1, 2014, was admitted into evidence at trial.

[12] Floyd testified that she and Appellant began communicating on June 3, 2014, when she was 23 years old. They had "[m]ostly just regular conversation as well as sexual things." Appellant asked her if she wanted to meet, but they never did. On June 4, when Appellant talked about playing guitar at his church and thinking about "being with someone else" even though he was married, Floyd asked him if his conscience "ever kick[ed] in." Appellant said, "Nope." She then asked him, "So what do you plan on doing," and he said he did not know. On June 11, Appellant sent Floyd a picture of his erect penis and they discussed the possibility of her coming over to his home after Leanna left in the morning; Appellant said that it would be "Risky," but then said, "As long as I can pound that c**t I'm game for risk." On June 13, he told Floyd that he was "[v]ery" happy in his marriage, "[m]inus sex" because he was "to much of a sexual freak." A record of Appellant's messages with Floyd beginning June 3, 2014, was admitted into evidence. This record includes a thumbnail-size version of the picture of Appellant's penis that he sent; a full-page copy of this penis picture was admitted as a separate exhibit.

house day care center, which Cooper had attended since infancy.[13]

According to Appellant, after waking up again, Cooper played with his toys and watched cartoons until about 8:00 a.m. During this time, from 7:15 to 8:16 a.m., Appellant responded to four Whisper posts, three non-sexual and one sexual, and sent a message to Smith saying, "You can come suck me today."[14]

Appellant and Cooper left their home around 8:30 a.m. Appellant drove a Hyundai Tucson SUV, and Cooper sat in a red, rear-facing car seat, which was placed in the middle seat in the back row. The top of the car seat was 3.5 inches from the back of the driver's seat.[15] There was conflicting testimony about whether the

---

[13] The sign-in logs from Little Apron as well as testimony from Leanna and Cooper's teachers demonstrated that Appellant dropped off Cooper at the day care center most mornings, although Leanna took him occasionally.

[14] The non-sexual Whisper posts were about hating waking up early, coffee enemas, and the MacBook Air laptop. The other post was about a vibrator; Appellant replied, "I bet sex with you is amazing," and expressed regret that he could not experience it.

[15] The Tucson had five seats, two in front and three in back. The Tucson's rear passenger windows and rear windshield were tinted darker than the driver and front passenger windows and front windshield. After Cooper's death, pictures, video, and measurements of the interior of the Tucson were taken before the car seat was removed. They were admitted into evidence at trial. Also, the measurements were used to replace the car seat, and the jury

11

top of Cooper's head extended over the top of the car seat. When measured at his autopsy, Cooper was 33 inches tall, and Detective Phil Stoddard, the lead detective on the case, testified that the child height limit for the car seat was 30 inches. Leanna, however, testified that Cooper's head was at least two inches from the top of the car seat. She further testified that a picture taken on April 20 of Cooper in the car seat, in which the top of his head was not above the top of the car seat, showed how Cooper looked in the seat when she last remembered seeing him in the car seat on June 5 and that he had not experienced any "growth spurts" since that time.[16]

(c) *The visit to Chick-fil-A*

---

was allowed to view the Tucson with the car seat replaced. The jurors were not allowed to enter the vehicle, but could walk around the Tucson and look in the open driver's door. Additionally, David Dustin, an expert in creating three-dimensional (3-D) computer models, took 3-D scans of the Tucson with the car seat replaced. He also created a doll and put it in the car seat as a representation of Cooper when he took the 3-D scans. From these scans, Dustin created a 3-D computer model that was used as a demonstrative aid to show the location of things in the Tucson. Appellant's challenge to the admission of the 3-D model is discussed in Division 6 (b) below.

[16] One of Cooper's day care teachers, however, testified that Cooper "started hitting a growth spurt" and "stretching out more leading up to" June 18.

According to Appellant, because they were running late that morning, he decided to take Cooper to Chick-fil-A for a "daddy/son breakfast." The day care center fed Cooper breakfast if he arrived before 8:45 a.m.[17] Receipts found in Appellant's Tucson and testimony from Chick-fil-A and Home Depot employees showed that he frequently went to a Chick-fil-A restaurant near his Home Depot office for breakfast, but he usually dropped off Cooper at day care first and then went to the Chick-fil-A drive-through.[18]

On the way to the Chick-fil-A, Appellant got an email from one of his co-workers asking to move their meeting that was scheduled for 10:00 that morning to later in the day; Appellant responded to

---

[17] One of Cooper's day care teachers testified that Cooper usually ate breakfast at the center, and if Appellant and Cooper were running late, Appellant would call and ask them to hold breakfast for Cooper. Appellant also would sometimes call and let them know if Cooper ate breakfast at home or if they stopped at Chick-fil-A. He did not call on June 18.

[18] Appellant told Detective Stoddard that he took Cooper to breakfast at the Chick-fil-A "approximately 2 to 3 times a month," but a text message he sent Leanna on March 14, 2014 said "daddy/son bfast. We haven't done it in 2 mos," and there were no messages or testimony indicating that Appellant took Cooper for a daddy/son breakfast between March 14 and June 18. On the day of Cooper's death, Leanna told detectives that Appellant would take Cooper to Chick-fil-A "every couple weeks or so," but she testified that she did not actually know how often Appellant took Cooper to Chick-fil-A and her answer to the detectives was a "guess then, and it would be a guess now."

the e-mail at 8:46 a.m., agreeing to postpone the meeting. And Appellant responded to two Whisper posts, writing one comment about college final exams and one comment about how he thinks tall girls are sexy, but he's "not very single." At 8:59 a.m., Appellant and Cooper entered the Chick-fil-A, where they stayed eating breakfast for about 20 minutes.

Around this time, Appellant engaged in another conversation on Whisper (which the State emphasized at trial). At 8:55 a.m., shortly before walking into the Chick-fil-A, Appellant responded to a Whisper post that said, "I hate being married with kids. The novelty has worn off, and I have nothing to show for it." Appellant wrote, "I miss having time by myself and going out with friends." At 9:12, the poster responded, "Yeah, I have nothing. Every oz [ounce] of me is in being a perfect unappreciated wife with two little ones that drain out the rest of me. I dnt [don't] resent my kids, I resent him." At 9:15, Appellant wrote, "My wife is upset when I want to go out with friends," and "I love my son and all but we both need escapes." About two minutes later, the poster replied, "Maybe that's

14

our issue too. I need a break from 'love.'" At 9:24, Appellant responded, "Agreed," "*hug*," "We both need that."[19]

(d) *Driving from the Chick-fil-A to work*

Appellant and Cooper left the Chick-fil-A at 9:20 a.m. A Chick-fil-A employee testified that Cooper was awake when Appellant carried him out of the restaurant. According to Appellant, when he put Cooper in the car seat, he gave Cooper a kiss and said, "ready, let's go"; Cooper gave him a kiss back.[20] Appellant then drove directly to work instead of going to Little Apron Academy.

---

[19] During Leanna's testimony, evidence was presented that on May 7, 2014, Appellant sent Leanna a message that he was going to "have a drink or two tonight with the guys to celebrate the start of our company." Leanna expressed frustration that he "always" wanted to go out on Thursdays, when she wanted to be able to watch a television show on that night with her neighbor. After further discussion, Leanna wrote, "I didn't mean to be mean," and then explained that she felt like Appellant was "always going out" with his friends, whereas she rarely got to go out because her "priority" was Appellant and Cooper. Appellant responded: "But I want you to go out with friends." The conversation ended with Appellant saying, "I love you and cooper. And I love spending time with you guys."

[20] Detective Stoddard testified that Appellant told Leanna that Cooper said "school." That is not clear from the recording of Appellant's conversation with Leanna. When describing what happened when he put Cooper in the car seat, Appellant said, "he's like, he likes school," and then Appellant said something that is unintelligible. When Leanna was asked at trial if Appellant told her that Cooper was excited to go to school and said "school," she could not remember Appellant saying that. Cooper's teachers testified that he had recently started talking more and having conversations.

As shown by maps and testimony from Detective Stoddard, who made repeated test drives of Appellant's route in a rented Tucson, to get from the Chick-fil-A to Appellant's Home Depot office, Appellant had to turn right out of the restaurant onto a side road, turn right onto Cumberland Parkway, immediately move across two lanes into the left-turn lane, make a U-turn on Cumberland Parkway, and then continue straight to his office. To go to the Little Apron Academy, Appellant had to make the same U-turn but then immediately move into the left lane and turn left onto Paces Ferry Road. Detective Stoddard testified that the time between leaving the Chick-fil-A parking lot and making the U-turn was 30 to 40 seconds and after the U-turn, the time for deciding whether to go straight on Cumberland Parkway toward Home Depot or turn left onto Paces Ferry Road toward Little Apron was "almost instantaneous."[21]

---

[21] Detective Stoddard video-recorded his test drives. They show that it usually took him between 30 and 50 seconds to get from the Chick-fil-A to the U-turn lane. Depending on traffic, it took between five and 50 seconds to make the U-turn. He then got to the beginning of the left turn lane around ten seconds after making the U-turn. The overall time from leaving the Chick-fil-A to getting to the beginning of the left turn lane averaged a little over a minute.

The Chick-fil-A restaurant was 0.6 miles from Appellant's office building, and the drive took about four minutes. During his interview, Appellant said that during the drive, he "probably didn't even hear [Cooper] because he falls asleep really easily when you drive the car." He told Leanna, "[Cooper] wasn't making a sound. . . . I think he fell asleep." Later in their conversation, Appellant said, "I've never left him [in] the car. I've taken him to day care a million times cuz he loves it," and Leanna responded, "His belly was full of sausage biscuit and he fell asleep."

Leanna testified that Cooper was "comfortable" in his car seat, and it would not be unusual for him to fall asleep on the way home from day care or church. Leanna also testified that Cooper fell asleep quickly after eating, although the examples she gave involved Cooper falling asleep after lunch. Cooper's day care teachers testified that he was sometimes awake and sometimes asleep when Appellant dropped him off in the mornings (which was usually earlier than the time Appellant drove Cooper from the Chick-fil-A). One of the teachers testified that when Cooper got Chick-fil-A

17

breakfast, he was "[a]wake, active, normal" when he came in.[22]

Parking lot surveillance video recordings show that Appellant's Tucson pulled into the Home Depot building's surface parking lot around 9:24 a.m. Appellant drove past a parking space, backed up a short distance, and then pulled forward into the space, coming to a stop at 9:25 a.m. He opened his door part way 17 seconds later, stepped out of the vehicle 16 seconds after that, and shut the door three seconds later. Appellant then walked into his office building carrying a Chick-fil-A cup and his work bag. The parking space that Appellant selected had a parked car on the driver's side and a grassy patch on the passenger's side; it was open at the front and back for cars to drive by. Surveillance video from the parking lot showed that

---

[22] Leanna testified that when Cooper started going to day care, Appellant would text her a picture of Cooper every day after he dropped Cooper off to show that Cooper was there safely. She explained that as a new mother, she had trouble letting go. But once Cooper was in the toddler room and was moving around more, she recognized that it was harder to get a picture of him, so she told Appellant that he did not need to send the pictures anymore. One of the day care teachers testified that she noticed that Appellant stopped taking the pictures about two weeks before Cooper's death, and when she talked to Appellant about it, he said that he stopped because Cooper was "getting older."

throughout the day, various people walked or drove by the Tucson.[23]

(e) *Appellant's morning at work*

From 9:35 to 10:59 a.m., Appellant received and sent a variety of messages. The travel agent sent Appellant an e-mail listing several options for the planned family cruise; Appellant then searched online for information about one of the cruise lines. Smith sent him a message that she was in Hilton Head, and they had a conversation about Hilton Head. Appellant responded to four Whisper posts, including telling one user that he woke up at 5:30 because of his son. When the poster asked Appellant about his son, Appellant replied, "He's awesome." Floyd sent a message saying,

---

[23] The Home Depot employees did not have assigned parking spaces. The parking space Appellant chose was mostly shaded until about 10:00 a.m. One of Appellant's co-workers testified that the space Appellant chose on June 18 seemed to be farther into the parking lot than where she had seen him park before, but she did not see where he parked every day. She also acknowledged that Appellant chose a parking space where people could walk by the vehicle, instead of one of the spaces along a tree line. The spaces along the tree line were further from the office building. Surveillance video of the parking lot of the day of Cooper's death shows that these spaces were in the shade for more of the day than the space Appellant chose. The co-worker also testified that she had seen Appellant bring his guitar into work one day, and he told her that he did not want to leave it in his car because heat was bad for it. Parking lot surveillance video of Appellant walking into work with a guitar case on June 11, 2014 was played for the jury.

"It's morning, LOL." And Leanna sent a message asking if Appellant had gotten to work okay. Appellant responded, "Yep, yep," and said that he was going to the movie and would be home close to 7:00; Leanna replied, "Okay."

At 11:05 a.m., Hall asked about lunch in the group chat with Appellant, Milling, and Abdo. Appellant, Milling, and Hall went to lunch together on most work days. Appellant initially said that he did not want to go to lunch because he wanted to make sure he could leave by 4:30 p.m. for the movie. After more discussion about the benefits of going to lunch and deciding they could go to the nearby Publix, one of their frequent lunch spots, Appellant said, "ok come get me and Im in." Milling and Hall testified that when they went to lunch, either Appellant or Hall would drive because Milling had a two-seat car.[24]

---

[24] Milling testified that generally when deciding who would drive each day, "[i]t would just come up in the conversation for the day, and it would just kind of naturally decide itself." Milling did not find anything unusual about Appellant saying, "Come get me." Hall testified that there was nothing unusual about him driving to lunch that day and that he tended to drive more often than Appellant because it was easier to drive to the building where Appellant worked than the building where Milling and Hall worked.

20

(f) *Lunch*

At 11:38 a.m., Hall, with Milling as a passenger, picked up Appellant at the front of Appellant's office building, and they went to Publix. Milling and Hall testified that there was nothing unusual about Appellant's behavior at lunch or at all that day. On the way back from lunch, they stopped at a nearby Home Depot store so Appellant could buy some lightbulbs. Hall then dropped Appellant off at his Tucson and drove away.[25] Parking lot surveillance video shows that at 12:42 p.m., Appellant opened the front driver-side door, reached inside with one arm, and tossed the bag containing the lightbulbs (which were later found on the front passenger seat). About two seconds later, Appellant closed the door and walked away.[26]

The medical examiner who performed Cooper's autopsy

---

[25] In his interview, Appellant did not mention his trip to the Home Depot store or his visit to his Tucson when he described his lunchtime activities.

[26] The video recording was played for the jury. Detective Stoddard and a Home Depot security manager testified that based on the video, it appears that although Appellant slightly hunched over while tossing in the bag, he did not put his head inside the vehicle. The video, which is in the record but is not of good quality, appears to support this conclusion.

testified that if the temperature in the Tucson when Appellant returned to the vehicle after lunch was in the low 90s, Cooper may have still been alive at that time. An expert tested the temperature in the Tucson parked in the same space less than three weeks after Cooper's death, on a day when the outside temperatures were similar to the temperatures on June 18. The readings taken inside the Tucson on the testing day showed that at 11:35 a.m., the temperature on the car seat was 88 degrees Fahrenheit; at 12:30 p.m., it was 98 degrees; and at 1:00 p.m., it was 100 degrees. The highest temperature the vehicle reached on the testing day was 125 degrees at about 3:30 p.m.[27]

[27] Temperature records from the nearby Dobbins Air Reserve Base showed that at 11:58 a.m. on June 18, the outside temperature was 86 degrees, and on the day of the test, the outside temperature was 88 degrees at that time. Similarly, at 12:58 p.m. on June 18, the temperature was 87.8 degrees, and on the day of the testing, it was 88 degrees. The expert acknowledged, however, that temperature similarities alone did not take into account other conditions, such as where the sun or shadows fell on the day. He also explained that before beginning testing, he drove the Tucson around in the parking lot for about 30 minutes with the air conditioning on the same setting it had been set on when the vehicle was recovered, which he acknowledged was not necessarily the setting Appellant had the air conditioning on in the morning when he drove the four minutes from the Chick-fil-A to his office.

(g) *After lunch*

After lunch and the stop at the Tucson, Appellant returned to his office cubicle, where he sent more messages to women between 1:17 p.m. and 3:04 p.m. Appellant sent a message to Floyd saying, "Hi." After they chatted some, Appellant asked to see her breasts, and Floyd sent a picture. They then had some sexual conversation. C. D. sent a message saying "Stoppppp"[28] and then asked Appellant for a Marietta lunch restaurant recommendation. They talked about that and what Appellant was doing at work. Then Appellant asked to see a picture of her breasts, which she sent, and Appellant replied, "Yummy." They exchanged a few more sexual messages over the next 30 minutes, including Appellant asking, "When can I see your p**sy." Alexandra Swindell sent Appellant a message saying that she was "horny" and asking, "Why can't you come down here."[29] They

---

[28] Presumably this was responding to the message Appellant sent the night before, but as explained above, there was no evidence as to what that message said.

[29] Swindell, who was 23 years old at the time of trial in 2016, testified that she started communicating with Appellant in late 2012 or early 2013. They had sexual conversations and exchanged sexual photographs. Some time

had an intermittent sexual conversation over the course of an hour. Angela Cornett sent Appellant a message saying, "Sup." Appellant responded, and they continued to communicate sporadically for about 30 minutes, with the conversation turning sexual, including Appellant sending Cornett a picture of his erect penis and sharing that he almost got oral sex that day but the person got scared.[30]

At 3:16 p.m., Appellant sent Leanna a text message that said,

before February 2013, Appellant drove to the college dorm where Swindell was living, picked her up, and drove with her to a "back road." They parked, talked, and kissed, and Swindell performed oral sex on him. They never met again, although Appellant told Swindell that he wanted to. Appellant did not tell her that he was married or that he had a child, although he said that he had a girlfriend and "eventually he said they were engaged." On June 11, 2014, Appellant sent Swindell a picture of his erect penis. Appellant's messages with Swindell beginning on May 29, 2014, were admitted into evidence. This record includes a thumbnail-size version of the picture of Appellant's penis that he sent; a full-page copy of this penis picture was admitted as a separate exhibit.

[30] Cornett (whose age is not indicated in the record) testified that she and Appellant began communicating a few months before June 18. She said he gave her "kind of a creepy feeling" and although he seemed "adamant" about meeting up, she refused. She felt like he wanted just a "hook-up" and "sexual favors." Cornett testified that during their conversations, Appellant told Cornett that he was married and indicated that "he was not unhappy," but did not get the sex he needed at home. He also told her that "he wanted to sleep with as many different women as possible in his lifetime." All of Appellant's messages with Cornett on June 18 were admitted into evidence. The picture Appellant sent her of his penis was admitted as part of these messages, but not as a separate, full-page exhibit, although it appears to be the same as one of the pictures he sent to C. D., which as discussed below, was admitted into evidence as a full-page exhibit.

"When you getting my buddy."[31] Leanna texted back about 45 minutes later, "Call me. Are you not going home first?" Leanna and Appellant then had a phone conversation about who would be the best person to pick up Cooper from the day care center, and she agreed to get Cooper.[32]

(h) *Cooper's death is discovered*

Carrying his work bag, Appellant got into the Tucson to leave work at 4:16 p.m. and drove away about seven seconds later.[33] The Tucson's windows were rolled up. Appellant told Detective Stoddard that as he drove to the movie theater, he looked to his right to change

---

[31] Leanna testified that Appellant called Cooper "my buddy."

[32] Leanna testified that she was not sure if Appellant was planning to go home before the movie, and if he was going home first, she was going to ask him to pick up Cooper. Parents had to pick up their children at Little Apron by 6:30 p.m. each day. One of Cooper's day care teachers testified that Leanna usually picked up Cooper between 3:30 and almost 5:00 p.m. In her interview, Leanna said that she arrived at Little Apron to pick up Cooper at about 4:50 p.m. that day.

[33] The Home Depot security guard who was at the desk when Appellant left testified that Appellant said that he was going to the movies with someone. The guard thought that Appellant's sharing this information was odd and "out of his character." However, other people who worked with or were friends with Appellant described him as "a very friendly, gregarious, open kind of guy" and a "talker" who would "insert himself into conversation."

lanes and saw Cooper sitting in the car seat. He immediately pulled into a parking lot, which was about two miles from the Home Depot building, stopped the Tucson, jumped out, took Cooper out of the car seat, and laid the child on the pavement.[34] Four witnesses heard Appellant repeatedly yell, "What have I done?" Two of them heard him yell, "I've killed my son," and another one heard him "rant," "She's going to kill me."[35] That witness also saw Appellant "fumbling

---

[34] One of the officers who responded to the scene testified that Appellant chose a "more congested" route to the movie theater. To allegedly show that Appellant had "knowledge of the importance of having witnesses at a crime scene to corroborate your story," Detective Stoddard testified that on June 4, 2014, Appellant wrote, in a comment to a post online about a biker fight, that the only reason he believed one of the bikers was "the number of witnesses that stayed around to corroborate the story to the police."

[35] One witness testified that Appellant was "distraught visibly," with his demeanor changing "back and forth." This witness also testified that he told the district attorney's office that Appellant's demeanor "look[ed] like bad acting," but at trial he explained:

> [E]verybody grieves differently. I just kind of likened it to if it were my child, I would probably react a little differently. I'd shed tears. I wouldn't have put him on the — the hot asphalt on a hot day, as hot as it was. And I probably would have been a little more attentive. But again, everybody grieves differently.

On cross-examination, the witness testified that he did not know Appellant or how he "might react to trauma." Another witness testified that Appellant's "franticness" did not seem "sincere," but when she was interviewed on July 9, 2014, and asked if "anything seem[ed] suspicious," she said, "nothing suspicious at all."

around" with Cooper; the witness testified that Appellant may have been trying to do CPR but was not doing it correctly, so he moved Appellant out of the way and began CPR on Cooper, even though it was almost immediately clear to him that Cooper was dead.[36]

Appellant walked away from Cooper and began pacing the parking lot while on his phone. Appellant said in his interview that he was trying to call the Little Apron Academy so someone there could tell Leanna where Cooper was (although Leanna had a cell phone), but he was unable to get through.[37] At least two witnesses called 911, and the first officers on the scene arrived at 4:24 p.m.[38] The officers testified that when they arrived, Appellant was not near Cooper. When one of the officers tried to do CPR on Cooper, Appellant came closer, and the officers "shooed him away" to

---

[36] Appellant told Detective Stoddard that he attempted CPR "just for a few seconds" but "couldn't compose [him]self to do it," so someone else took over.

[37] After the officer who arrested him at the scene took his phone away, Appellant said that he needed it to call his wife.

[38] The State played two 911 calls at trial, and Appellant told Detective Stoddard that he did not call 911 because "four people" were calling 911.

continue CPR. One of those officers testified that Appellant went "from calm to shrieking to calm again" and "it just seemed very random and very odd." The other officer testified that Appellant made a "weird scream."[39]

About five minutes later, another officer responded to the scene. She saw Appellant pacing while talking on the phone and said that at first he "appeared kind of calm" and then started "yelling." She described his yelling as "unusual," calling it "monotone yelling" that seemed "real forced."[40] When the officer tried to speak with Appellant, he refused to immediately answer her request for identification, and after a verbal altercation, during which Appellant told another officer, "Shut the f**k up, my son just died," Appellant was handcuffed and put in the back of a police car. While in the police car, Appellant remained calm, sometimes turning

---

[39] The second officer put in his report that Appellant was "acting hysterical and extremely upset"; he testified that he wrote "acting" to indicate that Appellant "was not acting genuine."

[40] The officer admitted on cross-examination that she did not know Appellant, had never heard him yell before, and did not know how he dealt with trauma.

around to look out the back window, which was the direction of where Cooper was. When the officer asked Appellant what happened, Appellant said that he had forgotten to drop off Cooper at day care and he had forgotten to do a "second look" inside the car. He also said, "I swore I dropped him off."

When a crime scene technician examined the Tucson, Appellant's work bag was on the passenger-side floorboard and a Home Depot bag with lightbulbs was on the passenger seat. That technician testified that when he knelt down by Cooper, he smelled the odor of a "hot, musty, urine-soaked diaper." Wet areas on Cooper's backside indicated that he had an overfull diaper.[41]

---

[41] The technician acknowledged on cross-examination that he did not note this smell in his report, but explained that was because the smell was "unremarkable" to him and he does not usually note smells in his report. Another officer testified that when he put his head inside the vehicle, he noticed that "it smelled like . . . sweat and a diaper, and then also really had that unusual odor that I can only associate as with something that's dead." This officer testified on cross-examination that he mentioned the smell to Detective Stoddard that night and Detective Stoddard told him to write a report about it, but the officer then failed to write the report until a year later when Detective Stoddard reminded him.

Detective Stoddard and another detective testified that when Appellant's vehicle was being processed, "hours" after Cooper was found, they smelled an odor that they "associate with death." The other detective testified on cross-

Cooper's autopsy showed that he died from hyperthermia. The medical examiner testified that while dying, Cooper likely would have experienced nausea, a headache, and anxiety, and may have had seizures. Cooper also may have "struggled as he was becoming more and more uncomfortable." The medical examiner testified that Cooper had small abrasions on his head and extremities, which he may have gotten from rubbing or coming into contact with hot surfaces, like hot parts of the car seat, which may have caused him pain.

(i) *Appellant's interview and detention*

Eventually, the officer who initially detained Appellant drove him to the police station. As they drove, Appellant asked the officer how long she had been in law enforcement. The officer testified that this "chit chat" did not seem like what someone who had just lost a child would do, and it made her uncomfortable. When they arrived at the police station, Appellant again tried to engage her in what she

---

examination that he did not mention the smell in a report until about a year later, after having a conversation with Detective Stoddard and another detective.

described as "casual conversation," commenting that the handcuffs she used were different from the ones he had seen when working for the police in Alabama.[42]

Appellant was then interviewed by Detective Stoddard and another detective for about an hour and a half. While waiting to be interviewed, Appellant was video recorded alone in the interview room for about 14 minutes. For most of this time, Appellant remained calm, interspersed with brief periods of crying, yelling, or labored breathing. Eventually, Appellant began to cry and yell more, saying things like, "Oh, god," "My boy," and "Why?" During his interview, Appellant remained calm, appearing to tear up occasionally when talking about Cooper.[43] He told the detectives that his relationship with Leanna was good, aside from the typical

---

[42] Leanna testified that Appellant had worked at the Tuscaloosa Police Department for about three years. Appellant's brother testified that Appellant worked as a dispatcher.

[43] Detective Stoddard testified on cross-examination that he did not believe that Appellant was being genuine during "episodes" when Appellant was "yelling and screaming," and explained that if he had seen "tears coming of out [Appellant's] eyes" or his "nose start[ing] to run," that he would have been more likely to believe that Appellant was having a genuine emotional outburst.

marital "ups and downs." He also recounted his day, providing the details discussed above. He said that his forgetting about Cooper was an accident.

Appellant also said that he was aware of the danger of leaving a child in a hot car because he had seen "a news report about a guy who did this." Appellant explained that the man is now "an advocate for when you park, you turn around and look again, and I've been doing that because the [ ] worst fear for me is to leave my son in a hot car." Appellant also said that he watched a video online of a veterinarian describing how hot the inside of a car gets on a summer day. Appellant said that when he watched that video, he thought of how terrible it would be if his child were in the car.[44] Appellant also knew of a K9 officer in Alabama who left his dog in the car for ten minutes, and the "dog died of heat exhaustion immediately almost."

---

[44] Appellant's electronic records showed that he viewed this video, which was posted on Reddit, five days before Cooper's death. Detective Stoddard explained at trial that Reddit is "a social site where people can post articles and comment on those articles." Although the video was accessed twice within one second, both the State's and Appellant's computer experts explained that this does not necessarily mean that Appellant watched the video, which was a little over five minutes long, twice.

Leanna, who had been met by two police officers at Little Apron Academy, was brought to the police station to be interviewed. She told the officers that leaving Cooper in the car was a "big fear" of hers, noting that she had heard about it on the news. She testified that she had talked to Appellant about the danger at some point, and she and Appellant had seen a public service announcement for the "Look Again" campaign on the morning news.[45]

Shortly after Appellant's interview ended, Detective Stoddard told Appellant that he was being arrested for felony murder and cruelty to children. Appellant said that he did not understand why because he had said that it was an accident.[46] Appellant was then taken to a holding cell, where he spoke to a man who was finishing

---

[45] Appellant's e-mail records showed that on January 30, 2013, Leanna sent him an e-mail with the subject line "Don't be this dad" that had a link that appears to be for a news story from "My Fox Atlanta" with the title "NY Dad Forgets Baby in Car for 8 Hours on Cold Day." And Appellant received two e-mails from "Quality Care for Children" on this topic: one on April 17, 2014, with the subject line "Look Again!" and a message about the danger of leaving a child unattended in a vehicle, and one on May 13 about a two-year-old girl who died in Georgia after being locked in her mother's car.

[46] A second detective who had been brought into the room to witness Detective Stoddard informing Appellant of his charges testified that Appellant used the phrase "malicious intent," which the detective found suspicious.

a 24-hour DUI sentence. The man testified that Appellant's demeanor and conversation did not seem consistent with someone who had just lost a child: Appellant seemed "pretty calm and nonchalant" and did not seem sad or upset.[47]

Appellant was then allowed to talk to Leanna in an interview room.[48] He was crying and told her that "it was an accident." Appellant said that he was comforted by the fact that Cooper was in heaven and that even if he could, he would not bring Cooper back because "he's in Heaven and his time on earth is done." At the end of their 43-minute conversation, Detective Stoddard came in and talked to Appellant about the next steps of Appellant going to jail. Appellant asked Detective Stoddard how long he had been in law enforcement. Leanna testified that she thought the question was inappropriate at the time but also thought, "That's very typical

---

[47] The man also testified that he told his story about interacting with Appellant to the National Enquirer for $2,000. On cross-examination, he acknowledged that he did not know Appellant or how Appellant "handles stress and tragedy."

[48] As noted in footnote 10 above, this conversation was video-recorded and played for the jury.

Ross."

(j) *Appellant's online activity*

After Appellant was arrested, the online activity on his cell phone and personal and work computers was searched, showing the activity discussed above as well as the following. On April 28, 2014, Hall said in the group chat with Appellant, Milling, and Abdo, "so r/childfree exists" and "it's the r/atheism of not having kids."[49] Appellant went to the website and about three minutes after Hall's messages, responded in the chat, "grossness." Over the next seven minutes, he clicked on three articles in the subreddit, one about a woman who posted an ultrasound of her IUD (intrauterine device), one about a woman returning from prison, and one about a blind person having difficulty dating.

The State's computer expert also testified that Appellant searched "how to survive in prison," but Appellant's expert testified that Appellant actually searched "what is prison really like" and he

---

[49] Hall was referring to two "subreddits" — "childfree" and "atheism." A subreddit is a Reddit page dedicated to a specific topic. See "Subreddit," https://www.dictionary.com/e/slang/subreddit/ (published Nov. 21, 2018).

made this search around the same time he told one of his friends that he was just finishing watching a season of Orange is the New Black, a Netflix show set in a prison. The State's expert also testified that Appellant cleared his Chrome browser cache on June 6, 2014, but had not cleared his Firefox browser cache. The State's expert testified that this was "extremely suspicious." Appellant's computer expert disagreed; he and two of Appellant's web development co-workers testified that Chrome is frequently used for web development and that clearing that browser's cache is standard practice to see if a website change has been effective.[50] Appellant's computer expert also testified that Appellant did not search for what temperature it takes for a child to die in a hot car or "anything like that," and the State's computer expert testified that Appellant did not search "hot car." Detective Stoddard also testified that Appellant did not do any "hot car searches."[51]

---

[50] One of Appellant's co-workers explained that the best practice is to test sites in multiple browsers, including Firefox, but acknowledged that checking only in Chrome "happens a lot."

[51] The State's computer expert also testified "as far back as April 21,

(k) *Appellant's online sexual communications with C. D.*

As noted in footnote 7 above, Appellant began communicating online with C. D., initially through Whisper, in the fall of 2013, when she was 16 years old.[52] C. D. testified that she told Appellant her age "pretty soon" after they began communicating, and their conversation was "generally sexual." C. D. testified that Appellant asked for pictures of her vagina "countless" times, and the record of

2014," Appellant had been visiting the website for Griffin Psychology, a site that dealt with "interviewing of witnesses, jury selection, forensic evaluations," and on May 9, 2014, Appellant had looked at a "divorce/legal separation checklist" webpage on Home Depot's site, which came up when Appellant searched "name change." On cross-examination, the State's expert admitted that he did not know that Appellant was a web developer for Griffin Psychology. And when Appellant's computer expert testified, e-mails from February 2013 and May 2014 between Appellant and one of the owners of Griffin Psychology about web development work that Appellant was doing for Griffin Psychology and a chat message that Appellant sent to the group chat with Milling, Hall, and Abdo on May 12 saying that he got his Home Depot e-mail address changed were admitted into evidence. Appellant's expert also testified that Appellant did not do any searches about divorce, and Leanna and Appellant's friends and co-workers testified that Appellant went by "Ross," but his Home Depot e-mail address used the name "Justin."

[52] When C. D. testified at Appellant's trial, the second question the prosecutor asked (after asking her name) was how old she was; the sixth question was what grade she was in when she began communicating with Appellant; and the tenth question was how old she was at that time. The prosecution later asked what C. D.'s birthday was. C. D. turned 17 in May 2014. The record of the messages between Appellant and C. D. also shows that they exchanged messages about C. D.'s high school classes and prom.

his messages with her shows that he sent messages such as "I da[r]e you to show me your p**sy," and "I want to see it tonight and after you shave" on December 9, 2013; "I want to see your p**sy" on December 30, 2013; "I need to see your p**sy" on February 4, 2014; "I want to see your hot wet p**sy" on February 28; "P**sy? PLEASE PLEASE PLEASE" on March 7; and, as noted above, "When can I see your p**sy" on the afternoon of June 18. C. D. refused to provide any pictures of her vagina, but between March 6 and June 15, Appellant sent her five pictures of his erect penis.

Appellant also sent C. D. messages in which he described proposed sexual encounters in graphic detail, including: "Stroking and licking up and down my big dick," "Even if you say no," and "I'm going to put my dick in all of your holes" on February 9, 2014; "I want to f**k you, cum on your face/mouth, and make you feel like a c**k whore" on February 11; and "I really want you to taste my dick" on May 13. Although they never met, on May 29, they discussed the possibility of Appellant being C. D.'s "first blow job," and Appellant suggested, "Next week," "Meet me and suck me in my car?" During

38

this conversation, Appellant also instructed C. D., "put your finger down your throat" and "Imagine my dick back there." And on June 11, he sent her a picture of his erect penis and the message, "Wanna suck it?"

During their communications, Appellant also told C. D. that he loved his wife and would never leave her but was unhappy with parts of their relationship. C. D. testified that Appellant sometimes talked about Cooper, always "in good ways," saying that Cooper "was smart and things like that," and he sent her a picture of Cooper from their family vacation about three weeks before Cooper's death.[53]

(l) *Appellant's other extramarital sexual activities*

In addition to the many sexual messages and the sexual conduct discussed above, the State presented evidence that Appellant engaged in a substantial number of sexual conversations

---

[53] A record of Appellant's messages with C. D. beginning December 9, 2013, which contained only Appellant's side of the conversation until February 28, 2014, was admitted into evidence. This record includes thumbnail-size versions of the five pictures of Appellant's penis that he sent; full-page versions of the penis pictures were also introduced as five separate exhibits and were shown to the jury during C. D.'s testimony.

and one instance of sexual conduct with other Whisper users in the years before Cooper's death. In addition to C. D., Smith, Meadows, Floyd, Swindell, and Cornett (see the previous subdivision and footnotes 7, 8, 11, 12, 29, and 30 and accompanying text above), three of these other users testified.

M. B. testified that she was 15 years old in May 2014 when Appellant replied to her post on Whisper that said, "I love older guys." M. B. initially told Appellant that she was 18 years old, and Appellant sent her a picture of his erect penis. After brief further conversation, M. B. told Appellant that she was actually 15 years old, but Appellant did not stop the sexual conversation. Instead, he responded, "That's a nice p**sy for 15" and "Make me a naughty older g[u]y." He then sent messages that said, "I'd love you to suck my dick" and "I want to use your p**sy and stretch you out." He did not mention that he had a wife or son.[54]

---

[54] All of Appellant's conversation with M. B. happened on May 29, 2014. Their full conversation was admitted into evidence, including a thumbnail-size version of the picture of Appellant's penis that he sent; a full-page version of that penis picture was also admitted as a separate exhibit.

Molly Sims, who was 18 years old when she started communicating with Appellant around June 2012, testified about having sexual conversations and exchanging sexual pictures with him. Sims testified that Appellant asked to meet her a few times, but they never did. Appellant told her that he was married but would talk to and meet other women and that he had been caught cheating.[55]

Jacqueline Robledo, who was 19 years old when she began communicating with Appellant in the summer of 2013, testified that their conversations "immediately went sexual[ ]," including exchanging sexual pictures. Later in the summer, they met at Appellant's home and had sex. They did not meet again, although they continued to talk online and Appellant continued to ask her to meet. Appellant also told her in February 2014 that when he was on vacation, he used Whisper to meet up with a man and "had relations with him." Robledo testified that "as far as [she] knew," Appellant

---

[55] A record of Appellant's conversation with Sims beginning on December 10, 2013, and ending on June 11, 2014, was admitted into evidence.

"loved his wife and wanted to be with her" and "loved his son." On April 2, Robledo asked how Appellant's "little son" was, and Appellant responded "The best ever!!!!" and sent a picture of Cooper. When Robledo called Cooper adorable, Appellant responded, "He's the best." Robledo testified that Appellant never said anything "ugly or negative" about Cooper.[56]

Beyond these nine witnesses, Detective Stoddard testified about additional sexual conversations Appellant had with 21 Whisper users who did not testify, and records of all of those conversations were admitted into evidence. The dates of the conversations ranged from December 2013 to June 2014. Appellant sent messages to some users about his desire to have sex, including, "I'm addicted to using sex with strangers to make me sane" to one user and "I am a church guitar player, but I can lead somewhat of a double life" and "I'm to naughty for my own good" to another. He

---

[56] Appellant's messages with Robledo beginning December 11, 2013, with only Appellant's messages until January 29, 2014, were admitted into evidence. This record includes a thumbnail-size version of a picture of his erect penis that Appellant sent Robledo on April 14, 2014. Their last message was exchanged on June 15.

sent other users messages expressing unhappiness with being married, including "Get a divorce. I might" because "I'm a cheater" and "I'm addicted to sex"; "I miss being single" and "I just want to f**k a lot of girls, drink a lot, and have fun"; "My bad side wants to be single sometimes"; "I hate being married sometimes too" and "I've started cheating"; and "Sometimes being taken sucks" "Because I enjoy sex with different people."

In three other conversations, Appellant indicated that his child was the reason he stayed married. On December 25, 2013, Appellant told one user, "I cheat" "A lot"; when she asked why he did not get divorced, he answered "Kid" "And it's just sex." On January 25, 2014, when one Whisper user said, "My husband and I both know we aren't in love, but for me I stick it out for my kids," Appellant responded, "You're in my situation," and said his "situation" was "Married, 1 kid, fell for another girl, now I'm addicted to sex." Later in the conversation, Appellant said that he had "sex with four girls in the last year," and the user asked why Appellant did not get divorced. Appellant answered, "Kid." "It's the glue holding it

together," adding, "my secret sex addiction is real." Finally, he told another user on March 24, 2014, "My wife should divorce me and has no idea, but kids."

Two of the additional conversations read by Detective Stoddard were with Whisper users who told Appellant that they were underage girls. On January 25, 2014, Appellant sent a message to someone saying that he was "horny" and suggesting that she give him oral sex. After this user said that she was 14 years old, he told her that he did not want to go to jail and then ended the conversation, saying "I'm looking to get my dick sucked and you can't do it." On February 3, Appellant sent a message to a user who said she was 17 years old saying that he would pay her $50 for oral sex. They then discussed the possibility of Appellant coming to her high school during her lunch so she could give him oral sex in his car. He also discussed other sexual fantasies and they exchanged sexual pictures, including a picture of his erect penis. When the Whisper user told him that she "live[s] two lives," Appellant responded, "I have two lives too."

Detective Stoddard also testified that Appellant had done "800-some searches" for "escort services or things like that," including looking at Craigslist, Backpage, and "multiple porn sites." In May 2014, Appellant hired a prostitute for sex three times. The woman Appellant hired testified that he did not show any nervousness when they met in a hotel room for sex. Messages between Appellant and Leanna showed that during one of the encounters, Leanna asked Appellant to come home because she and Cooper missed him, but he said that he was helping his friend move.

Leanna testified that she had not been aware of most of this activity, although Appellant had admitted to her in 2008 that he had a "problem with pornography," and two years later she had found a message on his phone saying something like "show me your boobs." As a result of these revelations, Appellant asked his friend to be an "accountability partner" and help monitor his visits to pornography websites, and Appellant and Leanna spoke with their pastor and went to therapy for a time. They resumed therapy again in December 2012 or January 2013, when Leanna discovered

Appellant watching pornography, and in late summer or early fall 2013, when Leanna saw a message from a woman on his phone calling him "hon" or "babe."

(m) *Appellant's defense*

The State argued that Appellant intentionally and maliciously left Cooper to die in the Tucson because Appellant wanted to live a child-free life, divorce Leanna, and pursue his "double life" of having sexual relationships with many women. In response, Appellant argued that his leaving Cooper in the Tucson was an accident. Leanna, Cooper's day care teachers, and several of Appellant's and Leanna's family members and friends testified that Appellant was a loving, caring, and involved father to Cooper. There was no evidence that Appellant had previously abused Cooper in any way.

Dr. Gene Brewer, an expert in human memory systems, testified for Appellant as follows. "Prospective memory" is the type of memory that allows a person to remember what he is going to do next. If a "prospective memory goal" is counter to "routine behavior, periodically people will lapse into that routine behavior," which "will

cause them to forget their prospective memory goal." Prospective memory can fail when people are distracted, such as by fatigue, stress, or external events. This memory failure can happen in a "matter of seconds," certainly less than 40 seconds. When an intention is important, people tend to "remember to do it more," but even in cases with serious and tragic consequences, prospective memory failure is "still something that happens." Similarly, people who are "smarter" are less likely to forget, but "[t]hat in no way makes them immune to forgetting."[57]

Once a prospective memory failure happens, certain "cues" can trigger a person to remember, such as hearing the child. However, some things, such as seeing a picture of a forgotten child, would not be effective cues because they do not signal to the person that anything is different from the usual day (when the child would be in day care) and the person may have a "false memory" of dropping off the child. False memories happen because when a person does

---

[57] Dr. Brewer testified that Appellant "would classify as an intelligent person," noting that Appellant went to college and "was able to get gainful employment . . . doing some kind of programming."

something day after day, it may be difficult to determine if the memory of doing it is from a specific day. Based on Appellant's late night and early morning messages and information that he had been frustrated with a project at work, Appellant may have been tired and experiencing work stress on the day of Cooper's death. And difficult traffic maneuvers, such as the U-turn that Appellant had to make after leaving the Chick-fil-A, can be an external distraction that leads to memory failure.

On cross-examination, Dr. Brewer acknowledged that he had not seen a case of a child forgotten in a car with the same characteristics as this case, but he explained that he studied memory failures generally, rather than focusing on cases of forgotten children. Dr. Brewer also acknowledged that there could have been potential cues to trigger Appellant's memory, including his having only a Chick-fil-A drink rather than food plus a drink (which he would usually have if he went through the drive-through after dropping off Cooper); Appellant's responding to Leanna's message about Cooper; and Appellant's going back to the Tucson

after lunch. On redirect examination, however, Dr. Brewer testified that these may not have been effective cues for Appellant, explaining: "I can't find a single experience that I know that [Appellant] had that day that signaled to him that something was different, unique, or weird about the situation."

2. *The constitutional sufficiency of the evidence*

Appellant first argues that the evidence presented at his trial was insufficient as a matter of federal constitutional law under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), to support his convictions for malice murder and cruelty to children.[58] In considering this claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). Thus, in contrast to the harmless-error

---

[58] Appellant's counsel did not argue at trial that Appellant was not guilty of the crimes against C. D., and on appeal, Appellant does not dispute the sufficiency of the evidence proving those three counts, nor does he challenge those convictions on other grounds. The evidence as to those crimes was overwhelming. Accordingly, we affirm those convictions.

analysis that we conduct in Division 5 below, "[i]n evaluating this [legal sufficiency] claim, we view the evidence in the light most favorable to the verdicts, leaving the resolution of questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence to the discretion of the trier of fact." *Heard v. State*, 309 Ga. 76, 82 (844 SE2d 791) (2020) (citation and punctuation omitted).

Appellant was charged with malice murder in violation of OCGA § 16-5-1 (a) for causing the death of Cooper with "malice aforethought," and with first-degree cruelty to children in violation of OCGA § 16-5-70 (b) for "maliciously" causing Cooper "cruel or excessive physical pain." It was undisputed that Appellant left Cooper strapped into a car seat in the Tucson and that the heat in the vehicle over the course of the day caused the child's death. And the medical examiner testified without dispute that as Cooper died, he likely would have experienced nausea, a headache, and anxiety; may have had seizures; and may have experienced pain from rubbing against or coming in contact with hot surfaces in the Tucson.

The only real disputed issue was whether Appellant intentionally and maliciously left his child to suffer that painful death, as the State argued, or whether Cooper's death was accidental, as Appellant claimed. See OCGA § 16-2-2 ("A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."). Appellant contends that there was insufficient evidence to support the State's theory. As discussed in more detail in Division 5 below, the evidence showing Appellant's malicious intent was far from overwhelming. But when viewed in the light most favorable to the verdicts, the evidence recounted in Division 1 above was legally sufficient for a rational jury to conclude that Appellant maliciously left Cooper to die.

Regardless of Appellant's motive, which was not an element of the crimes, see *Smart v. State*, 299 Ga. 414, 418 (788 SE2d 442) (2016), the jury could have concluded that Appellant did not forget that Cooper was in the Tucson in the short time between leaving the

51

Chick-fil-A and arriving at work — particularly given the proximity of the car seat to Appellant's driver seat and resolving against Appellant the disputed evidence about Cooper's being awake and his head being visible above the car seat. Among other things, the jury could have found suspect Appellant's 30-second delay in the vehicle after parking at his office; his visit to the Tucson after lunch (a visit he did not mention in his interview with Detective Stoddard); his failure to see or smell Cooper in the vehicle when Appellant returned to the Tucson after work; and his reactions after discovering that Cooper was dead, which several witnesses described as "very odd" or "forced." Thus, the evidence was legally sufficient to support Appellant's convictions for the crimes against Cooper. See *Finney v. State*, 311 Ga. 1, 14 (855 SE2d 578) (2021) (concluding that the evidence was "legally sufficient when all of the evidence is viewed in the light most favorable to the prosecution," even though "the properly admitted evidence was far from overwhelming"); *Strong v. State*, 309 Ga. 295, 300, 317 (845 SE2d 653) (2020) (concluding that the evidence was sufficient as a constitutional matter to support the

appellant's conviction for felony murder, even though "the evidence that [he] did not act in self-defense was not overwhelming"); *Heard*, 309 Ga. at 82-83 (holding that although the evidence that the appellant participated in the crimes for which he was convicted was "not strong," it was constitutionally sufficient); *Boring v. State*, 289 Ga. 429, 432 (711 SE2d 634) (2011) ("[T]he evidence, while far from overwhelming, was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty of the crimes of which she was convicted.").

3. *The admission of the evidence of extramarital sexual activities*

Appellant next argues that the trial court abused its discretion by admitting the extensive evidence of his extramarital and sometimes illegal sexual activities recounted in Division 1 above. Some of the evidence that we will discuss in this division was clearly admissible to prove the three alleged crimes involving C. D., including evidence of her age and Appellant's sexual messages with her. And other evidence, particularly the sexual messages with

other minors, may have been admissible for that purpose. However, as discussed further in Division 4 below, the trial court ruled that all of the evidence of Appellant's sexual activities was admissible to prove the charged crimes *against Cooper*, and that determination led to the court's denial of Appellant's motion to sever the counts involving C. D. Accordingly, in this division we will consider only whether the evidence of Appellant's sexual activities was admissible as to the alleged crimes against Cooper.

As we will explain, the messages that Appellant exchanged on the day of Cooper's death were relevant and admissible as intrinsic evidence. However, even assuming that all of the evidence of sexual activity was relevant to show Appellant's motive, the trial court should have excluded much of this evidence under OCGA § 24-4-403 ("Rule 403") as needlessly cumulative and prejudicial and three entire categories of evidence as highly and unfairly prejudicial: the evidence that Appellant exchanged sexual communications with four minors; the nine full-page pictures of Appellant's erect penis that he sent to girls and women; and the evidence that Appellant

hired a prostitute for sex three times.

(a) *Applicable law*

As provided by OCGA § 24-4-401 ("Rule 401"), "relevant evidence" is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The test for relevance is "'generally a liberal one,'" *Mattei v. State*, 307 Ga. 300, 304 (835 SE2d 623) (2019) (citation omitted), and "[r]elevance is a binary concept — evidence is relevant or it is not," *Olds v. State*, 299 Ga. 65, 75 (786 SE2d 633) (2016).

OCGA § 24-4-402 says: "All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules . . . . Evidence which is not relevant shall not be admissible." One of those limiting rules is Rule 403, which says:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We have explained that "'the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly,'" but also that "'[t]he major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Flowers v. State*, 307 Ga. 618, 622-623 (837 SE2d 824) (2020) (citation omitted).

"'The probative value of evidence is a combination of its logical force to prove a point and the need at trial for evidence on that point.'" *Armstrong v. State*, 310 Ga. 598, 603 (852 SE2d 824) (2020) (citation omitted).

> Generally speaking, the greater the tendency to make the existence of a fact more or less probable, the greater the probative value. And the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered. Probative value also depends on the marginal worth of the evidence — how much it adds, in other words, to the other proof available to establish the fact for which it is offered. The stronger the other proof, the less the marginal value of the evidence in question.

*Olds*, 299 Ga. at 75-76 (citation and footnote omitted). "'If the

evidence offered is cumulative of other evidence already admitted, its probative value is limited to the additional strength it gives the point already made.'" Id. at 76 n.15 (citation omitted).

As to the consideration of prejudice under Rule 403, this Court has explained that "in a criminal trial, inculpatory evidence is inherently prejudicial; 'it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion.'" *Anglin v. State*, 302 Ga. 333, 337 (806 SE2d 573) (2017) (citation omitted; emphasis in original). "Rule 403's term 'unfair prejudice' speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on an improper basis rather than on proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172 (117 SCt 644, 136 LE2d 574) (1997).

Finally, OCGA § 24-4-404 (b) ("Rule 404 (b)") says in relevant part:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence is admissible under Rule 404 (b) only if the proponent of the evidence shows:

(1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Strong*, 309 Ga. at 300.

Rule 404 (b) is not applicable to "intrinsic" evidence. See *Heade v. State*, 312 Ga. 19, 28 (860 SE2d 509) (2021). Intrinsic evidence is evidence that "aris[es] from the same transaction or series of transactions as the charged offense," is "necessary to complete the story of the crime," or is "inextricably intertwined with the evidence regarding the charged offense." *Middlebrooks v. State*, 310 Ga. 748, 750 (854 SE2d 503) (2021) (citation and punctuation omitted). Evidence may be intrinsic if it "pertain[s] to the chain of events explaining the context, motive, and set-up of the crime" and "is linked in time and circumstances with the charged crime, or forms

an integral and natural part of an account of the crime." Id. (citation and punctuation omitted). "[I]ntrinsic evidence remains admissible 'even if it incidentally places (the defendant's) character at issue,'" *Williams v. State*, 302 Ga. 474, 486 (807 SE2d 350) (2017) (citations omitted), but "[i]ntrinsic evidence must satisfy Rule 403," *Middlebrooks*, 310 Ga. at 751.

Because each of these Georgia evidence rules is modeled on its counterpart in the Federal Rules of Evidence, we may look to federal appellate precedents interpreting the pertinent federal rule for guidance in applying the state provision. See *Heard*, 309 Ga. at 85. This Court reviews the trial court's application of each of these evidence rules for an abuse of discretion. See *Middlebrooks*, 310 Ga. at 751; *Flowers*, 307 Ga. at 621. We note in particular that while the "'application of the Rule 403 test is a matter committed principally to the discretion of the trial courts,'" *Flowers*, 307 Ga. at 622 (citation omitted), that discretion is not unbounded, and appellate courts do not defer to it so much as to never conclude that the admission of evidence was erroneous. See, e.g., *Merritt v. State*, 311 Ga. 875, 881

(860 SE2d 455) (2021) (holding that the trial court abused its discretion under Rule 403 by allowing the State to question a defense witness about a prior unconfirmed allegation of sexual battery against his patients); *Strong*, 309 Ga. at 310-312 (holding that the trial court abused its discretion under Rule 403 by admitting evidence of prior violent acts to show the appellant's intent); *Ragan v. State*, 299 Ga. 828, 832 (792 SE2d 342) (2016) (holding that the trial court abused its discretion under Rule 403 by admitting, through the testimony of the murder victim's husband, five in-life photographs of the victim, some with her children); *Hood v. State*, 299 Ga. 95, 105 (786 SE2d 648) (2016) (holding that the trial court abused its discretion under Rule 403 by admitting testimony from two witnesses about the appellant's past drug deals).

(b) *The trial court's rulings*

In pretrial proceedings, Appellant objected to the admission of the sexual-activities evidence as irrelevant under Rule 401, not offered for a proper purpose under Rule 404 (b), and not admissible under Rule 403. The trial court, however, ruled that, with one

limited exception, all of the evidence of Appellant's sexual activities was intrinsic evidence of the crimes against Cooper or, in the alternative, was admissible under OCGA § 24-4-404 (b) to show the "circumstances immediately surrounding the charged crime," knowledge, absence of mistake, absence of accident, and motive.[59] The court further concluded that the probative value of this evidence was not substantially outweighed by unfair prejudice. At trial, Appellant again objected to the admission of the evidence, but the objections were overruled. The court did not give the jury any limiting instruction when the evidence was introduced or in the final jury charge.[60] In denying Appellant's motion for new trial, the trial court concluded that it correctly admitted the evidence as intrinsic

---

[59] The only evidence that the trial court excluded was "any evidence of pornography that is not admissible for any of the" proposed Rule 404 (b) purposes and "serves only to show [Appellant's] bad character."

[60] Although Appellant initially requested that a limiting instruction be given as part of the final jury instructions, the trial court withheld ruling on that request, and counsel for Appellant and the State later consulted and agreed that such an instruction need not be given, which was legally correct to the extent the evidence was intrinsic. See *Anderson v. State*, 313 Ga. 178, 183 (869 SE2d 401) (2022) ("[A] limiting instruction generally is not warranted for intrinsic evidence[.]").

61

or under Rule 404 (b) to show motive and rebut accident.

In this Court, Appellant again argues that all the evidence of his sexual activities was irrelevant and, even if relevant, should have been excluded under Rule 403 and Rule 404 (b).[61]

(c) *Rule 404 (b)*

As noted above, the trial court concluded that all of the sexual-activities evidence was intrinsic and, alternatively, that all of that evidence was admissible under Rule 404 (b). The evidence could not be both. See *Clark v. State*, 306 Ga. 367, 374 (829 SE2d 306) (2019) (explaining that "[b]ecause the evidence was intrinsic, it was outside the reach of Rule 404 (b)"). Indeed, the first purpose that the court listed as an appropriate Rule 404 (b) purpose for the evidence — the "circumstances immediately surrounding the charged crime" — is not a purpose enumerated in Rule 404 (b) and, more significantly, overlaps substantially with intrinsic evidence that is admissible because it is "linked in time and circumstances with the charged

---

[61] We note that Appellant does not dispute the admission of other message records, such as his Google chat logs with Milling, Hall, and Abdo.

crime." *Middlebrooks*, 310 Ga. at 750.

The trial court also clearly abused its discretion in admitting the sexual-activities evidence to show Appellant's intent, absence of mistake or accident, and knowledge, as indicated by the State's failure to defend these purposes on appeal. The evidence was not relevant to show intent, because the intent required for the alleged crimes against Cooper was different than Appellant's intent when he sent sexual messages and engaged in sexual conduct. See *Strong*, 309 Ga. at 309 ("'(T)he relevance of other acts evidence offered to show intent is established when the (other) act was committed with the same state of mind as (a) charged crime.'" (citation omitted)). For the same reason, absence of mistake or accident, which in this case is essentially another way of addressing Appellant's intent (that is, whether Cooper's death was the result of intentional acts or a mistake or accident), was not a proper purpose. See *Naples v. State*, 308 Ga. 43, 52 n.9 (838 SE2d 780) (2020) ("[C]onsiderations of 'intent' and 'lack of mistake or accident' overlap to a significant degree in this case."). And Appellant's sexual activities gave no

indication that he had any knowledge related to how to kill a child by leaving the child in a hot vehicle. See *Rouzan v. State*, 308 Ga. 894, 899 (843 SE2d 814) (2020) (explaining that "knowledge" in Rule 404 (b) generally refers to specialized knowledge, such as safecracking, or to "specific knowledge based on past experience").

That leaves only the Rule 404 (b) purpose of showing Appellant's motive for leaving Cooper to die in a hot car. Sometimes motive evidence is closely linked to the charged crimes in time and circumstances and constitutes intrinsic evidence; other motive evidence, such as acts committed further in time from the charged crimes, may be admitted as extrinsic acts under Rule 404 (b). See, e.g., *Middlebrooks*, 310 Ga. at 750 (treating evidence of the appellant's motive as intrinsic); *Worthen v. State*, 306 Ga. 600, 604-605 (832 SE2d 335) (2019) (considering evidence of motive under Rule 404 (b)). Cf. *West v. State*, 305 Ga. 467, 473 n.6 (826 SE2d 64) (2019) (discussing the similar treatment of attempts to threaten or influence a witness). But whether addressed under Rule 404 (b) or as intrinsic, the State must prove that Appellant committed the

other acts alleged (which he does not dispute was done here), that the evidence is relevant under Rule 401, and that the evidence satisfies Rule 403.

Thus, we need not decide whether some of the sexual-activities evidence offered to prove Appellant's motive (which is discussed in subdivision (e) below) would be better analyzed as intrinsic motive evidence or as Rule 404 (b) motive evidence. See *Flowers*, 307 Ga. at 622 n.6 (declining to decide whether the motive evidence at issue was better treated as intrinsic evidence or as other-acts evidence governed by Rule 404 (b)). We also need not decide which messages should be construed as "other crimes, wrongs, or acts" within the meaning of Rule 404 (b). Cf. *Early v. State*, 313 Ga. 667, 671 n.3 (872 SE2d 705) (2022) (explaining that when a video recorded inside a jail, introduced to show a statement that the defendant had made, included "no reference to a specific derogatory 'other act,'" Rule 404 (b) did not apply).

(d) *Sexual-activities evidence as intrinsic evidence*

We consider first the sexual messages that Appellant

exchanged on the day of Cooper's death and other evidence that may have provided context for those messages or was otherwise an integral and natural part of the story of that day.

(i) *Sexual messages that Appellant exchanged on the day of Cooper's death*

Evidence regarding the sexual — and the non-sexual — messages that Appellant sent and received beginning at 12:14 a.m. on June 18, 2014, and continuing throughout the day was necessary to complete the story of the charged offenses related to Cooper. The messages were closely linked in time to Cooper's death and helped to show Appellant's activities and state of mind both shortly before he left Cooper in the Tucson and while Cooper was dying or already dead there. Evidence of Appellant's online activities that day was thus an integral and natural part of the account of that day and was relevant as intrinsic to the charged crimes related to Cooper. See, e.g., *Keller v. State*, 308 Ga. 492, 505 (842 SE2d 22) (2020) ("Keller's behavior a few hours before he inflicted [the child's] fatal injuries — arguing with [the child's mother] regarding his treatment of the

66

murder victim and resorting to physical violence — 'plainly pertained to the chain of events in the case and was linked by time and circumstance with the charged crimes, making the information necessary to complete the story for the jury.'" (citation omitted)); *Tyner v. State*, 305 Ga. 326, 332 (825 SE2d 129) (2019) ("Tyner admitted to police that, in quick succession, he threw Mickel's purse, the ropes with which Mickel was bound, and Mickel herself from his car. Any evidence regarding the taking of Mickel's purse was thus 'linked in time and circumstances with the charged crime' and was properly admitted[.]").

Turning to Rule 403, the probative value of the messages that Appellant sent and received on June 18 was high (whether or not they involved sexual content). The central issue at trial was Appellant's intent when he left Cooper in the Tucson. Evidence of Appellant's words and activities leading up to his leaving Cooper in the vehicle and while Cooper was dying in the vehicle was highly probative as to that question. See OCGA § 16-2-6 ("A person will not be presumed to act with criminal intention but the trier of facts may

find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted."). See also *Collins v. State*, 312 Ga. 727, 741 (864 SE2d 85) (2021) ("'[C]riminal intent may be inferred from a person's conduct before, during, and after the commission of the crime.'" (citation omitted)). For example, evidence about the messages Appellant sent before he left Cooper in the Tucson was highly probative as to questions such as how Appellant was feeling about Cooper at the time, whether Appellant was intending to kill Cooper, and whether Appellant was experiencing stress or fatigue — factors that could have contributed to his forgetting about Cooper's presence in the vehicle. And evidence about the messages that Appellant sent while at work was highly probative as to questions such as whether and what he was thinking about Cooper, whether Appellant was distracted, and whether he should have been reminded that Cooper was in the Tucson.

It is true that much of the evidence of Appellant's sexual messages on the day of Cooper's death also may have had an unfair

68

prejudicial effect. The evidence showed in sometimes graphic detail that Appellant was an unfaithful husband with multiple online paramours with whom he conversed in lewd language. But the messages that day did not reflect the young age of the women or any activity that was facially illegal, and the evidence did not include any enlarged pictures of Appellant's penis. The prejudice did not substantially outweigh the high probative value of the messages. Cf. *United States v. Moe*, 810 Fed. Appx. 114, 118 (3d Cir. 2020) (holding that the trial court did not plainly err by admitting evidence of the defendant's extramarital affair, which was relevant in establishing where the defendant was and rebutting one of his defenses, and "its probative value outweighs any prejudicial effect"). Thus, the trial court did not abuse its discretion in admitting into evidence the sexual messages Appellant exchanged on June 18.

(ii) *Earlier sexual activities*

Evidence that is further in time from the alleged crimes may, in some circumstances, still be relevant as intrinsic evidence necessary to complete the story of the crime. See, e.g., *Harris v.*

69

*State*, 310 Ga. 372, 377-381 (850 SE2d 77) (2020) (holding that evidence that the appellant had been forced to leave the house by his ex-girlfriend about six months before the crimes was intrinsic evidence, as it explained why the appellant moved in with the victim and provided context to statements the appellant made before the murder, including "another woman will not put me out" and "I will kill her first"). In this case, although the State focused only on how Appellant's messages contributed to his motive on the day of Cooper's death, it is possible that specific messages from Appellant's online paramours could have contributed to, for example, Appellant's level of stress or distraction on June 18, which Dr. Brewer explained are relevant factors in considering whether Appellant experienced a prospective memory failure. For example, Appellant's messages to Meadows on the morning of June 17, which indicated that he was "sad" that she had again stopped responding to his messages, could have led him to be distracted by thinking about their relationship. Similarly, some of Appellant's entirely non-sexual messages from June 17, such as his messages with Milling,

70

Hall, and Abdo about going to a movie on June 18, were intrinsic evidence explaining Appellant's activities on the day of Cooper's death.[62] However, the many messages merely demonstrating Appellant's sustained sexual relationships with these women do not fit in this category.

We also note that some evidence of Appellant's history with the six women with whom he exchanged sexual messages on the day of Cooper's death may have been relevant to provide context for those messages, although the trial court did not admit any of the evidence on this specific basis. However, by introducing records of *all* of the messages available, the State went well beyond what was necessary to establish the context of Appellant's relationships. For example, Smith testified that she had been communicating with Appellant online since January 2014 and their conversations were often sexual; Appellant did not dispute that testimony. It is not apparent why the State had any need to establish the context of the

---

[62] As noted above, Appellant does not argue that the admission of this evidence was error.

relationship further. The probative value as to this issue of the 44 pages of messages exchanged between Smith and Appellant that were admitted at trial, which began five months before Cooper's death and included vulgar messages from Appellant, such as, "I want you to scream while my c**k stretches that p**sy," and "I want to f**k your tight little c**t till I blow my load down your throat" within the first ten pages, was exceedingly low and clearly outweighed by their prejudicial effect.[63]

Thus, Appellant's full message history was not admissible as providing context for the messages that he exchanged on the day of Cooper's death. The State argues, however, that these messages — like all of the sexual messages Appellant exchanged before the day

---

[63] This is a good place to note our disagreement with the dissent's assertion that "the average juror" would not have been "shocked" by Appellant's sexual messages. Dis. Op. at 303. We think most jurors (like most readers of this opinion) would be disturbed by messages using this sort of shockingly graphic sexual language — of which we have in this opinion quoted only a handful of examples, rather than recounting the dozens and dozens of similar messages that were admitted for the jury to see. (And we have used asterisks to soften the most profane words, which was not necessary for the few marginally offensive words at issue in *Smith v. State,* 302 Ga. 717, 723-724 (808 SE2d 661) (2017).) We also think most jurors would be shocked by having full-page pictures of erect penises needlessly displayed to them, although we have spared our readers any reproduction of those images.

of Cooper's death — were relevant to establish Appellant's motive. We turn now to that argument.

(e) *Sexual-activities evidence offered to prove Appellant's motive*

Appellant's sexual messages and conduct in the weeks, months, and even years before Cooper's death were not closely linked in time to the charged offenses relating to that event. The State argues, however, that this evidence was relevant to show that Appellant was motivated to kill Cooper by his desire to be free of his child and his marriage so he could indulge in his sexual pursuits unencumbered.

We have described "motive" as "'the reason that nudges the will and prods the mind to indulge the criminal intent.'" *Mattei*, 307 Ga. at 303 (citation omitted). But we have also cautioned that motive evidence must be "'logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged.'" Id. (citation omitted). Alleged motives that lack a specific, logical link to the alleged crimes, and instead define the alleged motive in a generic fashion, are often actually improper arguments

73

focusing on the defendant's bad character rather than a particular motive for the charged crimes. See, e.g., *Strong*, 309 Ga. at 312 (holding that the State's theory that Strong's motive for killing his wife's son and stabbing her grandson was "to control other people with violence . . . is a classic improper propensity argument" (citation and punctuation omitted)); *Carpenter v. State*, 305 Ga. 725, 726 (827 SE2d 250) (2019) (holding that evidence was not admissible to support a motive theory that indicated only "a general propensity to threaten others with violence"); *Kirby v. State*, 304 Ga. 472, 487 (819 SE2d 468) (2018) (explaining that the State's motive theory that Kirby's commission of "other violent crimes against women showed his 'inclination' to use violence to obtain money and sex . . . is a classic improper propensity argument, focusing on [his] violent, greedy, and lustful character"); *Thompson v. State*, 302 Ga. 533, 540 (807 SE2d 899) (2017) (holding that evidence of a subsequent attempted armed robbery was not admissible to show motive for two murders when "[t]here is no apparent reason that the subsequent attempted armed robbery shows evidence of motive rather than

propensity").

Courts must guard against propensity and bad-character evidence masquerading as motive evidence because it is fundamental to our criminal justice system that

> [t]he State is bound to prove the guilt of a defendant beyond a reasonable doubt, whether his character has been good or bad. It does not follow because an accused person may have a bad character, that he is guilty of the particular offense for which he is being tried.

*Bennett v. State*, 86 Ga. 401, 403 (12 SE 806) (1890). See also *People v. White*, 24 Wend. 520, 574 (N.Y. 1840) ("The sun of justice shines alike for the evil and the good, the just and the unjust." (punctuation omitted)).

(i) *Relevance*

In this case, the State's motive theory relied on a particular chain of reasoning: (1) Appellant wanted to have sexual relationships with many women; (2) Appellant's marriage impeded that goal; and (3) Cooper prevented Appellant from ending his marriage. It is important to recognize that the first two links in this chain had no direct relevance to Appellant's alleged motive for

killing Cooper. Contrary to the State's theory, a man does not normally enhance his ability to have sexual relationships with women by killing his young child. And also contrary to the State's theory, the impediments that marriage places on sexual relationships with multiple partners are normally overcome by cheating, divorce, or, in criminal situations, murdering one's spouse, not one's child.

The vast majority of the hundreds of Appellant's sexual messages that were admitted into evidence — including almost all of his messages with the nine women who testified about them — as well as all of the evidence about Appellant's sexual acts with Smith, Swindell, Robledo, and the prostitute he hired for sex, proved only the first link, which was also supported by Appellant's messages with anonymous Whisper users indicating that he was "addicted to sex." A much smaller subset of messages was relevant to the second link in the State's motive theory. As recounted in Division 1 (l) above, Appellant sent messages to several Whisper users saying that he "miss[ed] being single," he "regret[ted]" or "hate[d]" being

married "sometimes," and he "might" get a divorce. He also sent a message to Floyd indicating that his wife was an obstacle to Floyd coming to his home to have sex (although he ultimately said that he was willing to take the risk), and Meadows testified that Appellant told her that he was having problems in his marriage and that "if his situation was different[,] he would be with [Meadows] instead of [Leanna]."

Of all of the sexual messages and testimony, only messages exchanged with three Whisper users — none sent close in time to Cooper's death and all sent to anonymous users rather than any of the nine women who testified — were relevant to the final, and crucial, link in the State's motive chain. On December 25, 2013, when one user asked Appellant why he did not get divorced, Appellant answered "Kid" "And it's just sex." On January 25, 2014, Appellant told one Whisper user who said that she stuck out her marriage for her children that he was in the same situation and later told her that his "Kid" was the "glue holding [his marriage] together." Finally, on March 24, 2014, he told another user, "My wife

should divorce me and has no idea, but kids." Although a parent can end a relationship with a spouse and even with a child without murdering the child, these messages might conceivably be interpreted as suggesting that Appellant believed that he needed to kill Cooper to accomplish his well-established goal of having sex with numerous women.

Particularly because relevance is a liberal standard, see *Mattei*, 307 Ga. at 304, we will assume that all of the evidence of Appellant's sexual messages and conduct that contributed to proving any link in the State's motive theory was relevant under Rule 401. However, not all of this evidence was properly admissible under Rule 403.

(ii) *Rule 403*

With regard to the probative value of the sexual evidence, we begin by acknowledging that the State had a real need to establish Appellant's motive. Although motive is not a required element of the crimes at issue, Appellant's intent was the dispositive issue at trial, and proving that Appellant, whom substantial other evidence

showed to be a loving and caring father, had a motive to kill his child was important for the State in seeking to prove that he acted intentionally and maliciously. See, e.g., *Armstrong*, 310 Ga. at 603 ("[T]he prosecutorial need for the other acts evidence showing gang membership was high because, without it, it is unclear what motive Armstrong would have had to shoot Parrish in a crowded park merely because Parrish was in a dispute with Worthen." (citation and punctuation omitted)); *Smart*, 299 Ga. at 418 ("While motive is not an element of any of the charged offenses here, [the evidence of motive] was relevant to help the jury understand why Appellant might have used violence against [his wife]."). However, as discussed below, a large amount of the evidence of Appellant's sexual activities had minimal probative value in showing his alleged motive and was needlessly cumulative or highly prejudicial.

(A) *Needlessly cumulative and prejudicial evidence*

The first link in the State's motive theory — that Appellant wanted to have sexual relationships with many women — was readily proved and not disputed, and it was furthest from and the

least probative of a motive for murdering Cooper. Indeed, standing alone, the evidence that Appellant had a sex-crazed "double life" would not have been relevant to show his motive for murdering Cooper.[64] Without evidence that Appellant viewed Cooper as an obstacle to his sexual conquests, Appellant's obsession with having sexual liaisons with many women lacks a "logical and necessary link" to the alleged crimes against Cooper. *Kirby*, 304 Ga. at 487.

Yet the State was allowed to establish this relatively inconsequential fact with the testimony of 12 witnesses (nine women who exchanged messages with Appellant, Detective Stoddard, the prostitute, and the police officer who interviewed the prostitute) and hundreds of online messages (whereas the final, most crucial, and most disputed link in the motive chain relied on four messages Appellant sent to three anonymous Whisper users months before

---

[64] It is important to recognize that this "double life" — which the State repeatedly referred to at trial and the dissent repeatedly mentions as well — involved Appellant's deception of his wife and others around him regarding his sexual activities and proclivities. There was no evidence whatsoever that Appellant had any sort of secret life in which he harmed children or even talked about harming children.

Cooper's death). The messages that Appellant exchanged on the day of Cooper's death, which we have held were admissible as intrinsic evidence, established that Appellant had sexual relationships with at least five women other than his wife. We acknowledge that some amount of evidence on this issue beyond those messages may have been probative to show that engaging in this kind of extramarital sexual activity was an important part of Appellant's life, rather than a one-day affair (with five women), but there was a point at which yet another sexual message (or another 100 sexual messages) did not contribute to this issue in any meaningful way. Merely piling on more evidence to show the supposedly limitless extent of Appellant's sexual "depravity" (as the dissent puts it, see Dis. Op. at 298) did nothing to strengthen the link between his sexual obsession and the key question at trial — did this obsession motivate Appellant to kill Cooper?[65]

---

[65] The dissent suggests that the sexual-activities evidence must be highly probative of Appellant's motive because the State did not charge him with malice murder until after it discovered the extensive evidence of his extramarital sexual activities. See Dis. Op. at 298 n.92. Putting aside this odd

We need not decide precisely how much evidence the State should have been permitted to offer to support this initial point of its motive theory in order to conclude that a large amount of the evidence that was presented — especially the more prejudicial evidence of vulgar discussions — was *needlessly* cumulative and should have been excluded under Rule 403. See, e.g., *Corley v. State*, 308 Ga. 321, 326 (840 SE2d 391) (2020) ("[The jury] was well aware that Corley was interested in contacting law enforcement just prior to the shooting, and the testimony of a second neighbor about this interest would have had little probative value and would have been needlessly cumulative."); *United States v. Street*, 548 F3d 618, 625 (8th Cir. 2008) (holding that when there was "already considerable evidence introduced at trial establishing how the informants could have learned about details of [the victim's] death," "[c]alling another

---

deference to the State regarding what evidence is legally admissible to prove motive, Appellant was charged on the day of Cooper's death with felony murder based on first-degree cruelty to children, for allegedly "*willfully* depriv[ing] the child of necessary sustenance to the extent that the child's health or well-being is jeopardized." OCGA § 16-5-70 (a) (emphasis supplied). Thus, the State alleged that Appellant *intentionally* acted to kill Cooper from the get-go, before any of the sexual-activities evidence was discovered.

fifteen witnesses to reinforce this point would have been of little probative value, unnecessarily cumulative, and possibly confusing to the jury"). See also *Olds*, 299 Ga. at 76 n.15 ("'If the evidence . . . is cumulative of evidence already introduced, exclusion is more likely.'" (citation omitted)).

(B) *Highly and unfairly prejudicial evidence*

In addition to including a significant amount of needlessly cumulative evidence, the evidence of Appellant's sexual activities before the day of Cooper's death included three categories of evidence that were particularly problematic because of their trivial probative value and very prejudicial nature. Even assuming that each of these categories of evidence was relevant to the crimes against Cooper, the trial court should have excluded this evidence under Rule 403.

(1) *Sexual messages with minors*

The State presented evidence that Appellant sent sexual messages to C. D. beginning in the fall of 2013, M. B. in May 2014, and two other Whisper users who said they were minors in January

and February 2014. C. D. and M. B. testified about their communications with Appellant; Detective Stoddard testified about Appellant's communications with the two other minor Whisper users; and records of Appellant's messages with each of the four girls were admitted into evidence. With respect to the crimes against Cooper, although the messages Appellant exchanged with C. D. on the day of Cooper's death were intrinsic evidence, Appellant's other communications with her and with the other three minors served only the limited purpose of adding to the number of sexual communications Appellant had with women other than his wife, tending to prove only the first link in the State's motive theory, which, as discussed above, was already amply supported.

This evidence did nothing whatsoever to help prove the other two links in the State's motive chain. Indeed, C. D. testified that Appellant told her that he loved his wife and would never leave her and always talked about Cooper "in good ways," and the messages with M. B. and the two other minors did not mention that Appellant

was married or had a child.[66] There was nothing unique about Appellant's interactions with any of these four girls — except that they were minors, a fact that was not important to the State's motive theory at all. Thus, the probative value of this evidence with regard to the counts involving Cooper's death was trivial at best. See *Olds*, 299 Ga. at 76 (explaining that if a point is proved by other strong evidence, "the marginal value of the evidence in question" is decreased).

On the other hand, the unfair prejudice flowing from evidence that Appellant sent graphic sexual messages to minors was extremely high. Not only did the jury hear many of the lewd sexual messages Appellant sent to these minors read aloud by C. D. and M. B. themselves and by Detective Stoddard, but the jury was given the

---

[66] Although we noted in Division 3 (d) (ii) above that some of Appellant's prior messages with the women with whom he communicated on the day of Cooper's death may be relevant as providing context to that intrinsic evidence, C. D.'s age was not relevant to those messages or necessary to provide context. To the extent the jury may have been able to discern C. D.'s approximate age from her appearance as she testified, that would have been only an inference that she was young, not a confirmation that she was so young that Appellant committed crimes by having sexual communications with her. Moreover, the State introduced Appellant's messages with many other Whisper users through Detective Stoddard without calling those women and girls to testify.

full record of all of the messages to review during deliberations. Even beyond the testimony from C. D. and M. B. about their ages and the messages from the girls expressly telling Appellant their ages, many of the messages Appellant exchanged with these girls implied that they were inappropriately young for Appellant to be engaging in sexual conversations with them. For example, C. D. sent Appellant messages about her high school classes and going to prom; Appellant sent a message to M. B. that she had "a nice p\*\*sy for 15" and that she should "[m]ake [him] a naughty older g[u]y"; Appellant wrote to the 14-year-old anonymous user that he did not want to go to jail and therefore she could not be the one to fulfill his desire to "get [his] dick sucked"; and Appellant discussed meeting the 17-year-old anonymous user at her high school so he could pay her for oral sex in his car. Appellant's apparent sexual interest in minors was highly prejudicial. See, e.g., *United States v. Preston*, 873 F3d 829, 839, 841 (9th Cir. 2017) (holding that evidence that the appellant masturbated to a picture of his scantily clad eight-year-old stepson was "highly prejudicial," even in a case involving a child

molestation charge, explaining that "a jury confronted with such disgusting evidence is likely to conclude that the defendant 'is the type' to molest a child").

Compounding that prejudice, Appellant was being prosecuted only for the crimes against C. D. See *Strong*, 309 Ga. at 311 (explaining that the unfair prejudicial effect of other-act evidence was made worse because "as far as the jury knew, Appellant had escaped any punishment for this litany of" other crimes). See also *Old Chief*, 519 U.S. at 181 (noting "'the risk that a jury will convict for crimes other than those charged — or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment'" (citation omitted)). There was no evidence that Appellant had been charged with any crimes related to, for example, the felonies of soliciting an act of prostitution and sodomy from the anonymous 17-year-old Whisper user,[67] or crimes associated with sending M. B.

---

[67] See OCGA §§ 16-6-12 ("A person commits the offense of pandering when he or she solicits a person to perform an act of prostitution in his or her own behalf . . . ."); 16-6-13 (b) (2) (making a conviction under OCGA § 16-6-12 a felony punishable by imprisonment for ten to 30 years "when such offense

graphic messages describing sex.[68] Even worse, the prosecutor

hinted at Appellant's lack of punishment for his communications

with M. B. during closing argument, saying that Appellant "was

messaging with what turned out to be a 15-year-old girl. Something

we didn't find out about until after indictment."[69]

---

involves the conduct of a person under the age of 18 years"); 16-6-15 (b) ("A person convicted of solicitation of sodomy when such offense involves the solicitation of a person or persons under the age of 18 years to perform or submit to an act of sodomy for money shall be guilty of a felony . . . .").

[68] See OCGA § 16-12-100.2 (e) (1) ("A person commits the offense of obscene Internet contact with a child if he or she has contact with . . . someone he or she believes to be a child via a computer wireless service or Internet service . . . and the contact involves any matter containing explicit verbal descriptions or narrative accounts of sexually explicit nudity, sexual conduct, sexual excitement, or sadomasochistic abuse that is intended to arouse or satisfy the sexual desire of either the child or the person . . . ."), (e) (2) ("Any person who violates paragraph (1) of this subsection shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than ten years[.]"), (b) (1) ("'Child' means any person under the age of 16 years."). See also OCGA §§ 16-12-103 (a) (2) ("It shall be unlawful for any person knowingly to . . . furnish or disseminate to a minor . . . [a]ny . . . printed matter however reproduced . . . which contains any . . . explicit and detailed verbal descriptions or narrative accounts of sexual excitement [or] sexual conduct . . . which, taken as a whole, is harmful to minors."); 16-12-102 (3) (defining "minor" as "a person less than 18 years of age"), 16-12-105 (a) (explaining that, with a limited exception not applicable here, a person convicted of this crime is "guilty of a misdemeanor of a high and aggravated nature"). OCGA § 16-12-103 (a) (2) was the basis for one of the counts related to C. D.

[69] We held in *Heade* that the prejudicial effect of evidence that Appellant had committed prior crimes was lessened because the trial court instructed the jury to consider that evidence only for certain limited purposes, even though

88

This serious unfair prejudice wholly outweighed whatever minimal probative value Appellant's sexual interactions with minors had in establishing the existence of the first link (and only the first link) of his alleged motive for killing Cooper. This was precisely the sort of evidence that Rule 403 exists to exclude: "'matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Flowers*, 307 Ga. at 622-623 (citation omitted).[70] Thus, the trial court abused its discretion in admitting this evidence as to the crimes against Cooper. See *Carlton v. State*, 356 Ga. App. 1, 8-9 & n.7 (846 SE2d 175) (2020) (holding that evidence about the appellant's "history of sexually deviant behavior," including "sexually deviant behavior toward persons under the age of sixteen," a sexual relationship with "a naïve

---

the evidence was admitted as intrinsic evidence. See 312 Ga. at 27. On the other hand, we held in *Strong* that in light of "the seriousness of most of the multiple uncharged acts and the lack of evidence that Appellant faced punishment for any of them," the prejudicial effect was not eliminated by a jury instruction to consider the other-act evidence only as to the crimes charged. 309 Ga. at 311 n.18. In this case, no limiting instruction was given.

[70] Again, we are not addressing the admission of this evidence to prove the crimes against C. D., which should have been severed. See footnote 58 above and Division 4 below.

teenager," and "sexual abuse of minor children," was inadmissible under Rule 403 when its value in proving the charged attempted aggravating stalking was "marginal" and "the prejudicial effect greatly outweighed any possible probative value").

(2) *Full-page copies of pictures of Appellant's erect penis*

As recounted in Division 1 above, the State introduced into evidence multiple pictures that Appellant sent women of his erect penis. Nine of these pictures were admitted twice — once as thumbnail-size photographs embedded in the record of the messages Appellant exchanged with the women, and again as separate, full-page (8.5 by 11 inches), color exhibits. These pictures were sent between March 6 and June 15, 2014; none of the pictures were identified as being sent on the day of Cooper's death. Notably, at oral argument in this Court, the State's counsel acknowledged that she did not know of a proper purpose for which the prosecutor introduced these nine, enlarged copies of pictures of Appellant's erect penis.[71]

---

[71] Notwithstanding the State's concession that there was no basis for admitting them, the dissent insists that even these enlarged, duplicative penis pictures were properly admitted. See Dis. Op. at 303 n.97.

When presented as included in the record of the messages Appellant exchanged with women, the pictures Appellant sent women of his erect penis may have been minimally probative in illustrating the sexual nature of Appellant's online conversations (which yet again was probative only of the first link in the State's motive argument). The probative value of presenting nine of these images as separate, larger exhibits was essentially non-existent.

On the other hand, the unfair prejudicial impact of these pictures — and particularly pulling nine of them out of the message records as separate exhibits showing enlarged color images of Appellant's erect penis — was quite high. And the unfair prejudice as to six of the nine penis pictures was exacerbated by the fact that the jury learned, through the testimony of C. D. and M. B., that Appellant sent five of these pictures — the blown-up copies of which the State displayed to the jury — to C. D., someone Appellant knew was a minor, and sent one to M. B., someone Appellant later learned was a minor; these were not only vulgar acts but potentially criminal offenses. Thus, the trial court abused its discretion under Rule 403

at least by admitting the nine, separate exhibits showing full-page pictures of Appellant's erect penis. See *United States v. Hands*, 184 F3d 1322, 1328-1329 (11th Cir. 1999), corrected, 194 F3d 1186 (11th Cir. 1999) (holding that even if relevant to the charged drug crimes, evidence of the appellant's domestic violence had "minimal probative value" and the six photographs of the victim's injuries "had even less value" and were especially prejudicial because they were "superfluous," given the other evidence, and "impressed the fact of the domestic abuse on the jury's consciousness with dramatic, graphic impact").

(3) *Hiring a prostitute*

Two witnesses testified to establish that Appellant hired a prostitute three times in May 2014 — the woman Appellant hired and the police officer who interviewed the woman. Although this testimony may have been relevant for the limited purpose of adding yet another example of Appellant's sexual activities to demonstrate the first link in the State's motive argument, neither these witnesses nor anyone else indicated that Appellant's interactions with the

prostitute were hampered by his marriage or that he wanted to leave his wife — much less murder his child — in order to have more sex with her or other prostitutes.

The prosecutor asserted in closing argument that Appellant's hiring a prostitute showed "how his priorities were set and how this was escalating leading up to June 18, 2014." But other evidence also showed that Appellant's sexual activity included in-person liaisons as far back as 2013: Swindell testified that she had oral sex with him in February 2013; Robledo testified that she had sex with him in the summer of 2013; and Smith testified that she had sex with him in February 2014. In addition, Floyd, Sims, and Cornett testified that Appellant talked about meeting in person; Cornett even described Appellant as "adamant" about meeting and testified that he seemed to want "sexual favors" from her. Thus, even without the evidence of Appellant's hiring a prostitute, the jury was fully aware that his "priorities" included meeting other women for sex and had since early 2013. Moreover, although hiring a prostitute may be different in some ways than having sex with the women he met online, the

State has not explained how any such difference could help make Appellant's alleged motive to kill his child any more likely. Thus, the probative value of the evidence that Appellant hired a prostitute three times in May was trivial.[72]

The unfair prejudicial effect of this evidence was substantially greater. This evidence showed not only that Appellant repeatedly cheated on his wife but also that in doing so, he committed three more sex-related crimes. See OCGA §§ 16-6-12; 16-6-13 (a) (4) (punishment for second and subsequent offenses of pandering is a felony and a term of imprisonment of not less than one year). And again there was no evidence that he had been prosecuted or punished for these crimes. See *Strong*, 309 Ga. at 311. Thus, the trial court abused its discretion in concluding that the evidence of Appellant's repeated hiring of a prostitute was admissible under

---

[72] The dissent adopts the State's escalation theory, asserting that Appellant's sexual actions "progressed from online conversations to seeking in-person meetings, to eventually soliciting prostitutes when earlier efforts were unsuccessful." Dis. Op. at 300 n.96. But as just discussed, the evidence actually showed that Appellant's earlier efforts to engage in sexual liaisons with women he met online were not unsuccessful. In-person sexual conduct was always part of Appellant's extramarital sexual activities, rather than a new development near the time of Cooper's death.

Rule 403. See *United States v. Benanti*, 755 Fed. Appx. 556, 560-561 (6th Cir. 2018) (holding that the admission of evidence that the appellant cheated on his girlfriend with a dancer at a strip club was inadmissible under Rule 403 because "much of the detail about [the appellant's] affair had nothing to do with [the government's] asserted purpose[, a]nd that testimony was unfairly prejudicial: it described in great detail [the appellant's] liaisons with a stripper whom he paid for sexual favors, while cheating on a girlfriend who was soon to die"). Cf. *Wood v. Alaska*, 957 F2d 1544, 1552-1553 (9th Cir. 1992) (noting in a prosecution for rape that evidence that the victim "not only . . . had extramarital sex, but also . . . posed nude and had sex both for money and for the purpose of making pornography" was highly prejudicial in part "[b]ecause many people consider prostitution and pornography to be particularly offensive" and jurors could "be influenced by their impression of [the victim] as an immoral woman").

(f) *Conclusion*

Evidence showing the sexual messages that Appellant

exchanged on the day of Cooper's death and some contextual evidence of Appellant's earlier extramarital sexual activities was properly admitted as intrinsic evidence to tell the story of the alleged crimes involving Cooper or as evidence of Appellant's motive to murder Cooper. However, a large amount of the evidence offered to show Appellant's sexual interest in other women was needlessly cumulative, and three categories of evidence were unfairly prejudicial in a way that substantially outweighed their trivial probative value; all of that evidence should have been excluded under Rule 403. We will discuss the harm resulting from the trial court's error in admitting this evidence in Division 5 below.

4. *The motion to sever*

As noted at the beginning of Division 3 above, the question of whether some of the evidence discussed in that division — particularly the evidence related to C. D. and other evidence of Appellant's sexual activities with minors — was admissible at Appellant's trial for the crimes against Cooper is intertwined with the question of whether the trial court should have granted

96

Appellant's motion to sever for separate trials the three counts related to C. D. from the five counts related to Cooper. Because, as we concluded in Division 3 above, almost all of the evidence needed to prove the counts related to C. D. was inadmissible as to the counts related to Cooper, the trial court abused its discretion by denying Appellant's motion to sever.

Before trial, Appellant filed a motion to sever the counts related to C. D. After a hearing, the trial court denied the motion. The court first correctly held that the alleged offenses against Cooper and against C. D. were not joined "solely because of their same or similar character." But the court then ruled that because the evidence related to C. D. would be admissible in a trial for the alleged crimes against Cooper, severance was not required, and the court declined to exercise its discretion to sever the counts, concluding that "considering the number and complexity of the offenses charged and . . . the nature of the evidence . . . , the trier of fact will be able to parse the evidence and apply the law with regard to each charge."

Counts alleging criminal offenses may be joined in one indictment "when the offenses . . . are of the same or similar character" or "are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." *Harrell v. State*, 297 Ga. 884, 889 (778 SE2d 196) (2015) (citation and punctuation omitted). "If the charges are joined solely because they are of the same or similar character, a defendant has an absolute right to sever." *Stewart v. State*, 277 Ga. 138, 139 (587 SE2d 602) (2003). "'[W]here the joinder is based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the sound discretion of the trial judge[.]'" *Simmons v. State*, 282 Ga. 183, 185 (646 SE2d 55) (2007) (citation omitted).

When exercising that discretion, the trial court must determine if severance of the charges would "promote a fair determination of the defendant's guilt or innocence of each charge." *Harrell*, 297 Ga. at 889 (citation and punctuation omitted). Counts should be severed "to prevent a defendant from being forced to proceed 'at an unfair

disadvantage, due to confusion of law and evidence by the trier of the fact[s] and the "smear" effect such confusion can produce."' Id. at 891 (quoting *Dingler v. State*, 233 Ga. 462, 463 (211 SE2d 752) (1975)). Generally, "where evidence of one charge would be admissible in the trial of another, a trial court does not abuse its discretion by denying a motion for severance." *Simmons*, 282 Ga. at 185.

The first count related to C. D. alleged that Appellant attempted to commit sexual exploitation of C. D., a minor, by asking her to provide a photograph "involving the lewd exhibition of her genital and pubic area."[73] The State proved this count primarily with C. D.'s testimony and the record of Appellant's messages with her, which includes at least seven messages beginning at least seven months before Cooper's death in which Appellant attempted to

---

[73] "It is unlawful for any person knowingly to employ, use, persuade, induce, entice, or coerce any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual medium depicting such conduct." OCGA § 16-12-100 (b) (1). For purposes of this Code section, "minor" means "any person under the age of 18 years," and "[s]exually explicit conduct" includes "[l]ewd exhibition of the genitals or pubic area of any person." OCGA § 16-12-100 (a) (1), (4) (D).

convince C. D. to send him a photograph of her vagina. For the reasons discussed in Division 3 (d) (i) above, one of these messages — the one Appellant sent to C. D. on the afternoon of Cooper's death — was admissible as intrinsic to the alleged crimes against Cooper. All of the other messages were not properly admissible with respect to those offenses, however, nor was evidence of C. D.'s age.[74]

The other two counts related to C. D. alleged that between March 1 and June 15, 2014, Appellant sent C. D. messages with graphic descriptions of sex and pictures of his erect penis.[75] All of Appellant's messages describing sex were sent to C. D. by June 11, and all of the penis pictures were sent by June 15. Thus, these alleged crimes related to C. D. were completed three days before the alleged crimes against Cooper. This evidence did not help complete the story of Cooper's death, and, as explained above, it was not

---

[74] See footnote 66 above.

[75] As noted in footnote 68 above, OCGA § 16-12-103 (a) (2) prohibits the dissemination to minors of "explicit and detailed verbal descriptions or narrative accounts of sexual excitement [or] sexual conduct." OCGA § 16-12-103 (a) (1) prohibits dissemination to minors of "[a]ny picture . . . of a person or portion of the human body which depicts sexually explicit nudity . . . and which is harmful to minors."

properly admissible to prove Appellant's alleged motive to kill Cooper.

The State supplemented this proof with evidence of Appellant's earlier sexual messages with C. D. as well as his lewd messages with M. B. and two other anonymous minors, including his exchange of sexual pictures with a Whisper user who told him that she was 17 years old. That evidence may have been admissible with respect to the alleged crimes involving C. D. under Rule 404 (b) or OCGA § 24-4-414 (a), which says that "[i]n a criminal proceeding in which the accused is accused of an offense of child molestation, evidence of the accused's commission of another offense of child molestation shall be admissible and may be considered for its bearing on any matter to which it is relevant." See also OCGA § 24-4-414 (d) (defining "offense of child molestation" as including "conduct that would be a violation of . . . Code Section[s] 16-12-100 [and] 16-12-100.2"). But as discussed in Division 3 (e) (ii) (B) (1) above, this evidence was not properly admissible with respect to the charges involving Cooper.

Extensive evidence that Appellant was a man who commits sex

crimes against minors — admitted without any limitation — likely had a substantial "smear" effect that forced Appellant to proceed at an unfair disadvantage when trying to defend himself against offenses of an entirely different character involving Cooper. Thus, the trial court abused its discretion by denying Appellant's motion to sever. See *Harrell*, 297 Ga. at 890-891 (holding that the trial court erred by declining to sever an animal-cruelty count from the trial for endeavoring to intimidate court officers because they were "simply separate crimes of different character, committed 13 days apart"); *Booker v. State*, 231 Ga. 598, 599 (203 SE2d 194) (1974) ("[W]here the separate crimes did not arise out of the same conduct, did not involve the same victims or witnesses and the evidence of one would not be admissible on the trial of the other, the judgment of the trial court overruling the motion to sever was error as constituting an abuse of discretion."). See also *Mims v. State*, 304 Ga. 851, 857 (823 SE2d 325) (2019) (holding that counsel was deficient for not filing a motion to sever a car-theft offense from murder-related counts, because, although evidence of the appellant's possession of the car

was admissible in the murder trial to show the appellant's identity, "the fact that the car was stolen or that [the appellant] brought the stolen vehicle to Georgia from another state had no bearing on any of the murder-related offenses").[76]

5. *Harm*

Having concluded that the trial court erred by admitting a substantial amount of evidence about Appellant's sexual activities and by failing to sever the counts related to C. D. from the counts related to Cooper, we must now consider whether those errors require reversal of Appellant's convictions for the counts related to Cooper. Non-constitutional errors like these may be deemed

---

[76] To the extent that any evidence of Appellant's sexual activities may have been improperly admitted as to the crimes against C. D., and to the extent that Appellant should have had the three counts involving C. D. resolved in a separate trial, such errors had no probable effect on the jury's verdicts as to those counts. As noted above in footnote 58, Appellant does not claim that any errors affected his convictions for the crimes related to C. D., and the evidence of those crimes was overwhelming. See *Jackson v. State*, 177 Ga. App. 881, 881 (341 SE2d 511) (1986) (concluding that the seventh charge of sale of marijuana should have been severed from the trial of six others and reversing the defendant's conviction on the seventh count, but affirming his convictions on the first six counts because "it appears highly probable that the inclusion of evidence concerning the seventh count did not contribute to the guilty verdicts").

harmless only if "it is highly probable that the error[s] did not contribute to the verdict[s]." *Heard*, 309 Ga. at 90 (citation and punctuation omitted) (considering harm with regard to the erroneous admission of other-acts evidence). See also *Harrell*, 297 Ga. at 891 (considering harm with regard to the erroneous failure to sever counts). In making this determination, we consider the prejudice caused by the trial court's errors cumulatively, see *State v. Lane*, 308 Ga. 10, 17 (838 SE2d 808) (2020),[77] and we review the record de novo, weighing the evidence as we would expect reasonable jurors to have done, see *Heard*, 309 Ga. at 90. Accordingly, "[w]e will parse back through the evidence, because it looks different when not viewed only in the light most favorable to the guilty verdicts as we did in evaluating its legal sufficiency in Division 2 above." Id. at 92.

---

[77] *Lane* held that "Georgia courts considering whether a criminal defendant is entitled to a new trial should consider collectively the prejudicial effect of trial court errors and any deficient performance by counsel — at least where those errors by the court and counsel involve evidentiary issues." 308 Ga. at 14. In this case, the trial court's error in denying the motion to sever largely had the evidentiary effect of supporting the admission of the evidence regarding Appellant's exchange of messages and pictures with C. D. and possibly with the other minors. Thus, we will consider that error cumulatively with the trial court's error in failing to exclude evidence under Rule 403.

As discussed in Division 3 (e) above, extensive evidence regarding Appellant's sexual activities, including many crude and graphic sexual messages, was admitted to prove that Appellant wanted to and did engage in sexual activities outside of his marriage, a point that was the first link in the State's motive theory. A large amount of this evidence was needlessly cumulative and should have been excluded. The prejudicial effect of this overkill evidence was severely exacerbated by the highly prejudicial impact of the three categories of improperly admitted evidence discussed in Division 3 (e) (ii) (B) above. Each category of this evidence not only added to the already voluminous evidence showing that Appellant was an unfaithful husband but also revealed to the jury new, vulgar sexual conduct. Not only was Appellant a man who sent lewd sexual messages to a multitude of women online, but he also feloniously sent sexual messages to minors. Not only did Appellant send messages with crude descriptions of sex, but he also sent pictures of his erect penis — nine of which the State chose to enlarge as separate exhibits and thus emphasize to the jury. And not only did

Appellant have sex with women other than his wife, but one of those women he illegally hired as a prostitute.

Thus, this evidence was not "relatively benign" or merely cumulative, as we often have concluded in cases deeming improperly admitted evidence harmless. *Heard*, 309 Ga. at 91. See also, e.g., *Merritt*, 311 Ga. at 882; *Ragan*, 299 Ga. at 833. Instead, this erroneously admitted evidence added sharper, more damning, and more plainly criminal details to the State's portrayal of Appellant as a man of despicable character who deserved punishment.

The high risk of prejudice from this improperly admitted evidence "might be offset only by the most compelling properly admitted evidence of guilt." *Strong*, 309 Ga. at 317. Viewed only in the light most favorable to the prosecution, the evidence could be considered strong. But we must remember that when evaluating the harm resulting from trial court errors, we view the evidence more evenly, and thus we must recognize that for many of the State's strong points, Appellant offered a strong counterpoint. Viewed in this way, although the evidence was undisputed that Appellant left

Cooper in the Tucson for almost seven hours on a hot day, thereby causing the child's death, the evidence that Appellant did so intentionally and maliciously was far from compelling or particularly strong. See id. at 317-318 (explaining that although there was "no dispute" that the appellant stabbed the victims, the evidence that the appellant did not act in self-defense was "not overwhelming" enough to render the evidentiary errors harmless). The State presented evidence tending to show that Appellant purposefully left Cooper to die an agonizing death in a hot vehicle, but Appellant presented evidence tending to show that he was a doting father who accidentally forgot that his beloved son was in the vehicle. The determination of Appellant's intent was a close question.

The State presented evidence that would support an inference that Appellant could not have forgotten about Cooper's presence. Appellant spent about 20 minutes with Cooper eating breakfast at the Chick-fil-A before he secured the awake child in the car seat, which may have been three inches too short for Cooper and was

placed only inches behind Appellant's seat in the vehicle. Appellant then had to forget that Cooper was in the vehicle within just 40 to 60 seconds and not detect Cooper's presence during the remaining three-minute drive to work, during the more than 30 seconds he spent in the Tucson after parking, or when he returned to the vehicle after lunch (which he neglected to mention to Detective Stoddard during his interview). Appellant had to forget about Cooper for almost seven hours without anything triggering him to realize that he had failed to drop off his son at day care that morning.

And the jury may have found Appellant's behavior after work and when he found Cooper to be suspicious. Despite some testimony that there was an odor in the Tucson, Appellant said that he did not notice Cooper until he had driven away from work and was near a populated parking lot. Immediately after taking Cooper out of the vehicle, Appellant began pacing around the parking lot; he did not call 911 or Cooper's mother or do proper CPR. Witnesses described some of Appellant's behavior after Cooper's death as "very odd" or "forced."

Appellant also admitted that he was aware of the dangers of forgetting a child in a car, having watched a news report about a man who did that and received e-mails on the subject, allowing the jury to infer that Appellant used this knowledge to make Cooper's death appear to be an accident. And the prosecutor argued that the message Appellant sent to a stranger while he and Cooper were at the Chick-fil-A, saying, "I love my son and all, but we both need escapes," was proof that Appellant was ready to escape his fatherly responsibilities.

In support of Appellant's defense, his activities and behavior on the night before Cooper's death and during the day were not suggestive of someone who was plotting to or was actively engaged in killing his son in such a slow and painful way.[78] The night before Cooper's death, Appellant made plans to see a movie with friends

---

[78] It is not clear from the State's arguments at trial whether the State's theory was that Appellant had been planning to kill Cooper or that his decision to kill Cooper was an impulsive choice on the day. When discussing premeditation in closing argument, the prosecutor told the jury to remember that the State did not "have to prove that [Appellant] woke up that morning and at 7:55 decided: You know what? I'm going to murder my child."

the next day after work, an odd thing to do if he was planning to kill his child that day, and looked up child passport fees, indicating that he was planning a future trip with Cooper. The next morning, Appellant took Cooper into the Chick-fil-A for a leisurely breakfast, rather than driving straight to work or going through the drive-through.

Appellant then spent an entire workday without a trace of an indication that he knew his son was trapped dying in a hot car. He conducted Internet searches for a planned family cruise. He communicated with his many online paramours and Whisper users as usual, including telling one Whisper user that his son was "awesome." Rather than staying isolated, he went to lunch with his friends, who did not notice anything abnormal, and went back to the Tucson but did not put his head inside. Then he returned to work, sending more online messages that gave no indication that anything unusual was occurring. He did nothing that alerted Leanna that he had decided to harm Cooper but instead spoke with her on the phone about who would pick up Cooper. The jury certainly could have

110

concluded that Appellant could not have carried off this performance while knowing that his son was suffering a slow and painful death.

In response to the State's evidence supporting an inference that Appellant could not have forgotten Cooper, the defense presented the testimony of an expert in human memory, Dr. Brewer, who testified that prospective memory failure can happen in a "matter of seconds," even less than 40 seconds, and can happen even in cases like this where the prospective task is highly important and the person forgetting is intelligent. Dr. Brewer also testified that Appellant was experiencing factors that can contribute to memory failure, including fatigue, job-related stressors, and the immediate distraction of the complicated U-turn. The State cross-examined Dr. Brewer, but presented no contrary expert testimony.

Cooper's day care teachers and surveillance video showed that Cooper was asleep on some mornings when Appellant brought him into day care (usually at an earlier time than on June 18), and Leanna testified that Cooper regularly fell asleep when he had just eaten or when being driven around in the car seat; thus, the jury

could have inferred that Cooper fell asleep right after Appellant drove away from the Chick-fil-A or merely that Cooper made no noise during the drive. Leanna testified that Cooper's head was still two inches from the top of the car seat and that a picture from April 20 showing Cooper's head below the top of the seat was how he looked in the seat in June. And while Appellant did not get out of the Tucson immediately when he parked, the evidence indicated that he gathered his work bag and Chick-fil-A cup from the front of the vehicle, which would not have required him to look in the back where Cooper was.

As to Appellant's behavior after he discovered Cooper, Appellant told Detective Stoddard that he did not call 911 because he knew other people had and that he was too upset to correctly do CPR so someone else took over. This account was somewhat corroborated by the two 911 calls from witnesses played at trial and a witness's testimony about doing CPR after seeing Appellant "fumbling around" as if trying to do it. And one of the police officers who responded to the scene testified that when Appellant tried to

approach Cooper while another officer was doing CPR, Appellant was "shooed away." The witnesses and police officers who testified that they found Appellant's emotional response to be strange also acknowledged that they did not know Appellant or how he reacted to trauma. Leanna testified that Appellant's attempt to make small talk with the detective, while inappropriate, was in-character for him. Moreover, the witnesses' testimony about how they believed a man who has just accidentally killed his child should act was inconsistent — with some witnesses asserting that Appellant was acting too "hysterical" or "frantic[ ]" to be genuine, and other witnesses asserting that his "calm" demeanor was unexpected. Appellant's account of what happened to Cooper was consistent: he told the officer at the scene that he had forgotten to drop off Cooper at day care and had forgotten to do a "second look" inside the car, and he said in his interview with Detective Stoddard and in his conversation with Leanna that he accidentally forgot about Cooper.

As for Appellant's motive, the State demonstrated, with the evidence of his sexual messages and conduct that was properly

113

admitted, that Appellant had sexual relationships with many women other than Leanna and wanted even more. A fraction of this evidence also showed that Appellant was dissatisfied with his marriage, and an even smaller fraction indicated that Cooper was the only reason he was still married. This evidence allowed a strained inference that Appellant was motivated to murder his child so that he could end his marriage, thereby allowing him to have more sexual relationships.

However, as discussed above, the evidence suggesting that Appellant viewed Cooper as an obstacle to his ability to fulfill his desire to end his marriage was minimal, and without this evidence, it was not a reasonable inference that a man would believe that he had to kill his child (rather than, for example, his wife) to escape his marriage. Even the four messages (amidst hundreds) which indicated that Appellant stayed married because of Cooper did not indicate that Appellant thought his son needed to *die* to allow an escape from the marriage. Indeed, Appellant's successful engagement in many long-running online relationships suggested

114

that he was not actually hampered by Cooper's existence such that he needed to divorce Leanna, much less murder Cooper, to fulfill his desires. For example, Sims testified that she began communicating with Appellant in June 2012, two months before Cooper was born, and Swindell testified that she began communicating with Appellant in late 2012 or early 2013, shortly after Cooper was born. Both women continued their relationships with Appellant until Cooper's death.

Moreover, the State's weakly supported motive theory based on multiple inferences (the most important of which was supported by the least evidence) was contradicted by substantial evidence that Appellant loved and cared for his young son and had never mistreated Cooper, including testimony from Leanna (who had divorced Appellant before the trial), Cooper's day care teachers, and Appellant's and Leanna's family members and friends. Several of Appellant's online paramours testified that Appellant spoke about Cooper in loving terms. For example, he told Robledo that Cooper was "the best," and he told Meadows that "Cooper was his life" and

that he "wanted to be with Cooper for everything he did." Even the last messages that Appellant exchanged before leaving the Chick-fil-A, with the woman who posted "I hate being married with kids," made clear that the woman did not "resent [her] kids" and that, even though Appellant believed everyone needed "escapes," he "love[d] [his] son and all."

Thus, there was substantial evidence both supporting and undermining the State's claim that Appellant had intentionally and maliciously left Cooper in the Tucson. When the State's properly admitted evidence is not viewed only positively but rather is balanced against the evidence elicited by Appellant, the proof of Appellant's guilt was not "overwhelming," "compelling," or even strong. The jury deliberated for almost three and a half days. As a result of the trial court's errors, however, the jury also heard and saw strong and undisputed evidence that Appellant had felonious sexual conversations with 15-, 16-, and 17-year-old girls; illegally sent women and girls pictures of his erect penis; unlawfully hired a prostitute on several occasions; and engaged in a seemingly endless

series of lewd sexual conversations with a litany of women other than his wife. This improperly admitted evidence abundantly demonstrated Appellant's repugnant character — portraying him as a philanderer, a pervert, and even a sexual predator — and gave the jurors reason to believe that he would engage in other morally repulsive conduct (like leaving his child to die painfully in a hot car) and reason to punish him even if they were not convinced beyond a reasonable doubt that he committed the charged crimes against Cooper.

In sum, we cannot say that it is "highly probable" that the trial court's erroneous admission of evidence of Appellant's sexual activities and the court's denial of his motion to sever did not contribute to the guilty verdicts as to the crimes against Cooper. We therefore reverse Appellant's convictions for those crimes (Counts 1 to 5). See, e.g., *Heard*, 309 Ga. at 94 (noting that the evidence that Appellant committed the charged crimes was "shaky"); *Carlton*, 356 Ga. App. at 10 (holding that the improper admission of evidence of Appellant's "sexually deviant behavior" was not harmless in light of

the "highly disputed evidence" about whether the appellant had the requisite intent to commit the charged crimes); *Hands*, 184 F3d at 1332 (holding that the erroneous admission of the appellant's past acts of domestic violence was not harmless when the evidence that the appellant committed the charged crimes was "not overwhelming" and the appellant's domestic violence "was likely to anger the jurors and could have impelled them to render an adverse verdict in order to punish [him]").

6. *Issues that are likely to recur if Appellant is retried*

Appellant has raised a number of other enumerations of error related to his convictions for crimes against Cooper. Because the evidence was legally sufficient to sustain Appellant's convictions for those crimes, the State may choose to retry him. See *Heard*, 309 Ga. at 83 n.10. We will therefore briefly address the other issues raised by Appellant that appear likely to recur if he is retried.

(a) *Compelled disclosure of expert's notes*

The first issue involves the trial court's order compelling Appellant to disclose to the State notes written by Dr. David

Diamond, a potential expert witness whom Appellant consulted about incidents involving children forgotten in cars. As part of reciprocal discovery before trial, see OCGA § 17-16-2 (a), Appellant gave the State a PowerPoint presentation that Dr. Diamond planned to use during his testimony and a two-paragraph summary of the expert's anticipated testimony.[79] The State then spoke with Dr. Diamond. From this information, the State learned that Dr. Diamond had interviewed Appellant. The State filed a motion to compel Appellant to provide all documentation that Dr. Diamond created related to interviews with Appellant.

The trial court granted the State's motion, requiring Appellant to produce "any and all statements and writings memorialized in any manner regarding Dr. David Diamond's conversations, interviews, and discussions with [Appellant]." The court concluded

---

[79] The summary said that Dr. Diamond had reviewed driving routes and investigative reports about Appellant's response to his discovery of Cooper and noted that Dr. Diamond had interviewed Appellant. The summary did not identify any information that Appellant provided during the interview that helped form Dr. Diamond's opinion.

that pretrial disclosure was necessary under OCGA § 24-7-705 ("Rule 705") "to allow the State an opportunity for meaningful cross-examination."[80] As required by that order, Appellant then provided the State with the notes Dr. Diamond took in preparation for and during his interview with Appellant.[81] Appellant did not call Dr. Diamond to testify at trial.[82]

The trial court's pretrial order to compel was proper under Rule 705, which says:

> An expert may testify in terms of opinion or

---

[80] In its pretrial order, the trial court concluded that Dr. Diamond's notes were also required to be disclosed under a discovery statute, OCGA § 17-16-7; in its order denying Appellant's motion for new trial, the court concluded that a different discovery statute, OCGA § 17-16-4, as well as Rule 705, required disclosure of the notes. Because we conclude that the court's order requiring disclosure of Dr. Diamond's notes was proper under Rule 705, we need not decide whether the notes were otherwise discoverable.

[81] The notes consist of six pages, three typed and three handwritten. In an effort to avoid seeing any notes that were not properly discoverable, the State asked a prosecutor in the Brunswick Circuit District Attorney's office to examine the notes. The examiner put in a sealed envelope the three handwritten pages, which she determined were not subject to the order to compel because they were not actually related to Dr. Diamond's interview with Appellant.

[82] In denying Appellant's motion for new trial, the trial court held that Appellant had not preserved this claim for post-trial review because he did not call Dr. Diamond to testify at trial. We agree with that conclusion. See *McKoy v. State*, 303 Ga. 327, 332-334 (812 SE2d 293) (2018); *McAllister v. State*, 351 Ga. App. 76, 86-87 (830 SE2d 443) (2019). However, the issue may recur if Appellant is tried again.

inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. An expert may in any event be required to disclose the underlying facts or data on cross-examination.

While the second sentence of this rule is focused on disclosure during cross-examination, the first sentence explains that although an expert *may* testify about an opinion without first providing the facts or data underlying that opinion, the trial court *may* require otherwise. Federal courts applying the substantially similar Federal Rule of Evidence 705 have explained that the trial court has discretion in requiring the disclosure of "facts or data" underlying an expert opinion, including the ability to require that disclosure before trial. Indeed, the Advisory Committee Notes to Federal Rule 705 explain that the rule "assumes that the cross-examiner has the advance knowledge which is essential for effective cross-examination," as "safeguard[ed] . . . by the discretionary power of the judge to require preliminary disclosure in any event."[83] See

---

[83] "[A]lthough Advisory Committee Notes [to the Federal Rules of Evidence] are not binding precedent and cannot change the plain meaning of

generally 29 Charles Alan Wright et al., Federal Practice and Procedure — Federal Rules of Evidence § 6294 (2d ed. Apr. 2022 update) (explaining that under Federal Rule 705, the trial court may require disclosure of the basis for the expert's opinion before cross-examination in certain circumstances, including "where cross-examination would be ineffective to reveal the defects in the expert's underlying facts and data in a manner that permits the jury to properly weigh his opinion"). See also *United States v. Lawson*, 653 F2d 299, 302 (7th Cir. 1981) (holding that without a criminal defendant's access to the hearsay information relied upon by a State expert witness, "effective cross-examination would be impossible," and explaining that Federal Rule 705 "recognizes this requirement"). Indeed, to the extent that Georgia's statutes regarding pretrial discovery in criminal cases, see, e.g., OCGA §§ 17-16-4 and 17-16-7, provide less information about the bases for expert opinions than the federal rules, see, e.g., Fed. R. Crim. P. 16, Georgia

---

the law or rules, they are highly persuasive." *State v. Almanza*, 304 Ga. 553, 559 n.6 (820 SE2d 1) (2018).

122

courts may need to resort more often to pretrial disclosure under the authority of Rule 705.

Based on our review of the notes, it was reasonable for the trial court to conclude that Dr. Diamond based his expert opinion, at least in part, on information he obtained from Appellant's answering questions such as what he was doing during the drive from the Chick-fil-A, if he was in a hurry that morning, and what time he usually went to sleep and woke up compared to the day of Cooper's death. The State was entitled to know any information that Appellant gave Dr. Diamond which helped form the expert's opinion. Accordingly, the trial court did not abuse its discretion when it ordered pretrial disclosure of Dr. Diamond's notes under Rule 705 as necessary for meaningful cross-examination.

(b) *The three-dimensional model of the Tucson*

As discussed in footnote 15 above, David Dustin, an expert in three-dimensional (3-D) computer models, created a model of the inside of the Tucson, which was shown to the jury as a demonstrative aid. The laser and photographic scans used to create

the model were done after the car seat had been replaced in the vehicle based on crime scene measurements and photographs, and a doll created to represent Cooper was placed in the seat. Before trial, Appellant objected to the use of this model, arguing that it was a misleading re-creation. After a hearing at which Dustin testified about the process used to create the model, the trial court ruled that the model could be used, concluding that the evidence was "a demonstrative aid for the jury, which will help [the jurors] understand spatial proximities, distance, and the testimony of witnesses" in a way not possible "with the use of photographic and video evidence alone."

At trial, first a detective trained in 3-D scanning who helped create the model and then Dustin testified about the 3-D model.[84]

---

[84] During the cross-examination of the detective, Appellant pointed out that in making the model, the car seat had been placed at the wrong incline. After Appellant highlighted this discrepancy, the State asked the detective and Dustin to redo the models with the corrected incline. New scans were completed during the sixth week of trial, and a copy of the new 3-D model was given to Appellant on the day after it was finished. Appellant objected to the use of the new model, repeating the arguments made in his motion about the original model and also arguing that the new model was a discovery violation. The trial court ruled that the new model could be used. Although Appellant

No limiting instruction was given, but it was made clear through the testimony that the 3-D model was for demonstrative purposes only and had been created after Cooper's death from scans taken after the car seat had been replaced in the vehicle based on crime scene measurements and photographs. Appellant extensively cross-examined Dustin about the limitations of the model and the ways in which it differed from human sight. In denying Appellant's motion for new trial, the trial court ruled that the 3-D model was similar to a crime scene diagram and concluded that the probative value of the evidence — allowing the jury to see different angles of the Tucson and its interior — was not substantially outweighed by the danger of unfair prejudice, noting that the defense thoroughly cross-examined Dustin.

The "general foundation requirement" for demonstrative evidence is a showing that the conditions of the demonstration are "so nearly the same in substantial particulars to afford a fair

reiterates his argument based on the State's alleged discovery violation here, we need not decide this issue because we do not expect it to recur if there is a retrial.

comparison." *Rickman v. State*, 304 Ga. 61, 64 (816 SE2d 4) (2018) (citation and punctuation omitted). "'[T]he trial court has broad discretion to determine whether the substantial similarity requirement has been satisfied.'" Id. (citation omitted). Demonstrative evidence is also governed by Rule 403 and so may be excluded if its probative value is substantially outweighed by, among other things, the danger of misleading the jury and considerations of the needless presentation of cumulative evidence. See id.

In this Court, Appellant argues that the 3-D model did not meet the foundational requirement for demonstrative evidence because Dustin, who did not examine the crime scene on the day of Cooper's death, could not testify that the model was an accurate representation of the scene. However, the 3-D model was made from scans of Appellant's Tucson, and the detective and Dustin both testified that the car seat was placed back in the Tucson based on crime scene pictures and measurements. Thus, the trial court did not abuse its discretion in concluding that the general foundation

requirement was met. See, e.g., *Rickman*, 304 Ga. at 62, 65 (holding that the trial court did not abuse its discretion by admitting as demonstrative evidence six photographs "taken at the actual location of the shooting" in which "the same types of vehicles" were put "in the same positions as the actual vehicles" involved in the crimes based on surveillance video recordings of the crimes to help show, in part, "where the vehicles and people involved were in relation to each other"); *Bramblett v. True*, 59 Fed. Appx. 1, 10 (4th Cir. 2003) (holding that a lack-of-foundation objection to a video reenactment of a witness's vehicle being passed by the defendant's truck would have been futile because the witness testified that in the video, she again drove her vehicle down the same stretch of road under lighting conditions similar to the day of the accident).[85]

Appellant also argues that the probative value of the 3-D model was minimal because there was other evidence of the space and distances inside the Tucson, including photographs, video, and the

---

[85] The provisions of Georgia's Evidence Code governing the admission of demonstrative evidence mirror those in the Federal Rules of Evidence. See *Rickman*, 304 Ga. at 64.

jury's visit to view the Tucson. But the 3-D model was probative as to the location of things within the Tucson, and although the jury was presented with other evidence showing the interior of the Tucson, we cannot say that it was an abuse of discretion for the trial court to conclude that there was probative value in the State's presenting the evidence in a 3-D format allowing, for example, witnesses to show different angles of the Tucson as they testified.[86]

Finally, Appellant argues that any probative value of the 3-D model was substantially outweighed by the risk of misleading the jury because the model offered viewing angles that were not possible for the human eye. But the differences between human sight and the 3-D model were elicited during cross-examination of Dustin, and the jury could compare the model to the photographs and video of what the Tucson looked like on the day of Cooper's death. Thus, the 3-D model was not likely to mislead the jury. See *Rickman*, 304 Ga.

---

[86] Appellant contends that the 3-D model should not have been admitted at trial because no witness testimony actually was aided by the exhibit. We need not decide this issue because we do not expect it to recur if there is a retrial.

at 65 (holding that the fact that the demonstrative photographs were taken during the day, whereas the crimes happened at night, was addressed by the jury's ability to compare the staged photographs with the crime scene photographs, and "[b]oth the officer who testified and the trial court made it clear that the photographs did not show what actually happened"). See also *In re Air Crash Disaster*, 86 F3d 498, 539-540 (6th Cir. 1996) (holding that a computer-animated video depicting the operation of a circuit breaker at issue was not inadmissible under Rule 403, noting that the witness "could have drawn the same information on a sketch pad" and at least six witnesses testified about the circuit breaker's design).[87]

(c) *Questions related to statements made in search warrant affidavits*

---

[87] Appellant also argues that the doll that Dustin created to represent Cooper was misleading because its eyes were open and it was not slouching in the car seat, and no one could testify that this was how Cooper looked in the seat during the day of his death. We note that Appellant filed a separate motion objecting to the doll and its "unnaturally wide open" eyes; that motion was denied, and Appellant has not challenged that order directly on appeal. In any event, the trial court reasonably concluded that the presence of the doll was not unduly prejudicial because the jury was shown several pictures of Cooper after his death and heard the testimony discussed in Division 1 (b) above about how Cooper sat in the car seat during the time leading up to his death.

At trial, to support the argument that the police unfairly rushed to the conclusion that Appellant maliciously killed Cooper, Appellant sought to question both Detective Stoddard and Detective Shawn Murphy about certain allegedly false statements that Detective Murphy made in affidavits for search warrants for Appellant's electronic devices, including that Appellant had "researched" "child deaths inside vehicles and what temperature it needs to be for that to occur." The affidavits at issue were written by Detective Murphy based on information given to him by police officers other than Detective Stoddard. The State objected to this line of questioning for both witnesses, and the trial court sustained the objections on the grounds that the affidavits were hearsay, were not written and sworn to by Detective Stoddard, and were not based on Detective Murphy's personal knowledge.

Because Detective Stoddard did not write the affidavits or have any personal knowledge about why Detective Murphy wrote what he did, the trial court did not abuse its discretion in ruling that

Appellant could not ask Detective Stoddard about the statements. See OCGA § 24-6-602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter.").[88] However, the court did abuse its discretion when it prevented Appellant from asking Detective Murphy about the statements. Appellant's purpose in questioning Detective Murphy about the statements was simply to establish that the statements, which other evidence had shown to be false, were made in the warrant affidavits, which was relevant to Appellant's argument that the police rushed to judgment against him. Thus, Detective Murphy's testimony would not have been inadmissible as hearsay, because his prior statements were not offered to prove the truth of the matter asserted but rather the falsity of the statements. See OCGA § 24-8-801 (c) (defining "hearsay" as "a statement, other than one made by the declarant

---

[88] Appellant was allowed to ask Detective Stoddard if Appellant had done any Internet searches for "any video involving a vet or a hot car or anything like that," and the detective responded that he had not seen any evidence of that. On redirect examination, he testified that it would be untrue if anyone said that Appellant "Googled hot car searches, death, anything like that."

while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). And the testimony would have been based on Detective Murphy's personal knowledge of whether he made those statements in the warrant affidavits. Accordingly, the trial court abused its discretion in limiting Appellant's examination of Detective Murphy in this way. See, e.g., *United States v. Williams*, 865 F3d 1328, 1343 (11th Cir. 2017) ("When a statement is entered into evidence to show its falsity, the statement is not hearsay."); *United States v. Costa*, 31 F3d 1073, 1080 (11th Cir. 1994) ("The government offered the statement not for its truth, . . . but rather to show its falsity. By showing, through the introduction of other evidence, that Costa lied to his interrogators, the government sought to create an inference of Costa's guilt.").[89]

7. *Conclusion*

This is a widely known case of the sort that leads to fervent

---

[89] OCGA § 24-8-801 "is materially identical to Federal Rule of Evidence 801," so we may "look for guidance to federal case law applying the federal rule." *Westbrook v. State*, 308 Ga. 92, 102 (839 SE2d 620) (2020) (citation and punctuation omitted).

opinions based on pretrial publicity, which indeed required a change of venue for trial, and impressions based on media coverage of certain aspects of the trial. The truth is often more difficult to determine when it must be based on the law as applied to properly admitted evidence. We were not at the trial, and based only on the cold record before us, we cannot say for sure what was going through Appellant's mind when he shut the Tucson's door on the morning of June 18, 2014, and sealed Cooper's fate. We do not know whether Appellant planned and executed the horrific murder of his 22-month-old son by leaving him to suffer and slowly die in a hot vehicle, or rather if Appellant made a tragic, fatal mistake by forgetting that the child whom by almost all accounts he loved and cherished was in the back seat. Appellant's intent had to be determined by the jurors who saw and heard all of the evidence, with any reasonable doubt resolved in his favor. Based only on the evidence that was properly admitted regarding the alleged crimes against Cooper, it would be a difficult and close decision.

But as we have explained above, the jury also heard and saw

133

an extensive amount of improperly admitted evidence. The jury heard several days' worth of testimony from a dozen witnesses about Appellant's extramarital (and sometimes illegal) sexual activities, saw hundreds of lewd (and sometimes illegal) sexual messages that Appellant exchanged beginning in 2013 with numerous young women and girls, and were given nine full-page color photographs of Appellant's erect penis that ensured that the jurors did not miss the point that he was a repulsive person. Three sex crimes that Appellant committed against a 16-year-old girl were actually presented to the jury for verdicts (which were obviously guilty).

Much of this evidence was at best marginally probative as to the alleged offenses against Cooper, and much of it was extremely and unfairly prejudicial. We cannot say that it is highly probable that the improperly admitted evidence did not affect the guilty verdicts that the jury returned on the counts involving Cooper. If Appellant is to be found guilty of those crimes, it will need to be by a jury not tainted by that sort of evidence. For these reasons, we reverse Appellant's convictions for the counts related to Cooper.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Bethel, LaGrua, and Colvin, JJ., who concur in part and dissent in part.*

BETHEL, Justice, concurring in part and dissenting in part.

As the majority opinion correctly determines, the evidence presented by the State in regard to the crimes against Harris's son, Cooper, was constitutionally sufficient to support his convictions for those crimes under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). I also agree with the majority's assessment that, as uncontested by Harris, the evidence presented at trial as to the crimes committed against C. D. was overwhelming. I therefore join Divisions 1 and 2 of the majority opinion in full.[90]

However, I take issue with the conclusion reached in Divisions 3 and 4 of the majority opinion and its conclusion that Harris's convictions for the crimes against Cooper must be reversed for the reasons stated therein. Like the majority, I would rule that the

[90] I also see no basis in the other enumerations of error raised by Harris for reversal of the judgment in this case. To the extent the majority opinion addresses those enumerations, I join those portions of the opinion as well.

"extensive evidence" of Harris's "extramarital and sometimes illegal sexual activities" was relevant. Maj. Op. at 261. But I part ways with the majority opinion in its determination that the trial court abused its discretion by not limiting or excluding the presentation of some of this evidence under the balancing test in Rule 403 and the related balancing provision in Rule 404 (b) and by not severing the crimes against C. D. from the crimes against Cooper for trial. I therefore respectfully dissent as to Divisions 3 and 4 of the majority opinion.

> As noted in the opinion of the Court,
>
> [t]he State's theory was that [Harris] intentionally and maliciously abandoned his child to die a slow and painful death trapped in the summer heat, so that [Harris] could achieve his dream of being free to further his sexual relationships with women he met online.

Maj. Op. at 238. Because details relating to the cause and manner of Cooper's death were largely undisputed, intent (informed by motive) was the only real question in the case.[91] I believe the State was entitled to introduce, in detail, evidence of the nature, scope,

---

[91] In his opening statement, the prosecutor told the jury that whether Harris intended to kill Cooper was "the single question in this case[.]"

and extent of the truly sinister motive it ascribed to Harris. For that reason, I believe the trial court did not abuse its discretion in allowing the State to produce the evidence challenged by Harris in this appeal.

This is, in many ways, an extraordinary case. In the dozens of murder cases this Court considers each year, rarely do we see a case in which diametrically opposed conclusions could be reached by fair-minded jurors from the same evidence. Indeed, as the majority acknowledges in the conclusion of its opinion, a fair reading of the cold appellate record presents logical, common-sense cases both for Harris's guilt and his innocence. Was he the heartless, sex-crazed killer of the State's telling? Or a deeply flawed but loving father overwhelmed by the demands of life and work whose worst day resulted in his most costly mistake? And while that ultimate question is not before us, that view of the evidence and the arguments presented by Harris and the State greatly informs my

own consideration of the questions raised in this appeal.[92]

Here, to secure a conviction against Harris for Cooper's murder, the State was tasked with presenting evidence that satisfied each element of the charged offenses beyond a reasonable doubt. As noted above, intent was the linchpin of the case. The question then becomes how the State could go about proving that a father intended to kill his child.

In light of the theory it presented to the jury, the State had to prove that Harris's sexual appetites, proclivities, and compulsions were so strong and uncontrolled, and his level of personal discontent so unmitigated, that he would take the seemingly unfathomable step of intentionally and maliciously leaving his young son in a car to "cook" in the heat of the Georgia summer, as the State argued to the

---

[92] I also note that the police initially planned to charge Harris with felony murder predicated on cruelty to children. See Maj. Op. at 253. It was only after the discovery of extensive evidence of Harris's online activities and sexual history that he was charged with malice murder. While not legally conclusive, it is instructive to me that the State's decision to charge Cooper's death as an intentional and malicious killing only occurred once it discovered evidence suggesting that Harris had a motive to kill Cooper. Prior to that discovery, I presume, the State did not believe it was in possession of proof beyond a reasonable doubt that Harris acted with malice.

jury. In my view, the extraordinary task of proving the nature and allegedly limitless extent of those desires and the level of depravity asserted by the State gave the trial court the discretion to admit a detailed and wide-ranging body of evidence concerning those issues.[93]

In many murder cases, evidence of Harris's sexual activities, conversations, and desires (including his habit of sending and soliciting pictures of genitalia) would likely all be excluded as impermissible character evidence, as such evidence would rarely be probative of any issue in the case. But in my view, evidence on those issues was not introduced in this case merely to cast Harris in a bad light; that evidence went to the heart of the State's case. Likewise,

---

[93] The majority opinion notes that the State's theory of motive in this case is somewhat belied by the fact that "a man does not *normally* enhance his ability to have sexual relationships with women by killing his young child" and that "the impediments that marriage places on sexual relationships with multiple partners are *normally* overcome by cheating, divorce, or, in criminal situations, murdering one's spouse, not one's child." (Emphasis supplied.) Maj. Op. at 271. For me, these observations simply further the point that the State was attempting to demonstrate that Harris's obsessions were themselves abnormal and that proving that his strategy for overcoming impediments to fulfilling his hedonistic sexual desires — killing Cooper — required evidence of something more than a "normal" motive to kill.

the specific evidence that Harris solicited prostitutes on multiple occasions, unlawfully contacted minors, and engaged in explicit sexual conversations (including the aforementioned solicitation and exchange of sexual photographs) with them, while likely inadmissible in most murder cases, was probative of various facets of Harris's "double life" that the State was attempting to portray in its case-in-chief.[94]

Of course, the majority opinion is correct that the evidence in question painted Harris in a bad light and made him appear to be a

---

[94] The majority opinion notes that

> [a]lleged motives that lack a specific, logical link to the alleged crimes, and instead define the alleged motive in a generic fashion, are often actually improper arguments focusing on the defendant's bad character rather than a particular motive for the charged crimes.

Maj. Op. at 270. I completely agree, but I do not believe that the evidence at issue here fits that description. The majority opinion subsequently cites a number of cases in support of the point outlined above, see id. at 270-271, but each of those cases (*Strong*, *Carpenter*, *Kirby*, and *Thompson*) discusses this point in relation to "propensity" evidence rather than bad-character evidence. I do not view any of the evidence presented as being propensity evidence, as the State presented nothing showing that Harris had any inclination to use violence either generally or against Cooper specifically (in fact, there was significant evidence to the contrary). And while much of the evidence regarding Harris's sexual communications and behaviors doubtlessly reflected poorly on his character, it did not do so improperly, as that evidence was clearly linked (in the State's theory) to the alleged crimes.

person of low moral character. In fact, the evidence presented by the State repeatedly invited the jury to dislike Harris for the person he is and for the person he apparently dreamed of becoming. In addition to the physical evidence surrounding Cooper's death and its "discovery" and the evidence of Harris's reactions to learning that his son had just died, much of the evidence the State presented regarding Harris's motive was based on drawing out the details of his "double life." The State explicitly sought to paint him as a discontent sex-addict who felt tied down by the burdens and restrictions of career and family. Using Harris's own words from messages exchanged with various women, the State theorized that Harris sought to "escape" those self-imposed prisons and move on to another life filled with exciting sexual encounters and other new adventures.[95] Moreover, because Harris asserted from the very

---

[95] In the prosecutor's opening statement, he described Harris's online communications and sexual activities as his "obsession," which prompted him to take "risk after risk after risk." The prosecutor returned to this theme in his closing argument, telling the jury that Harris "closed the door on [Cooper's] little life because of his own selfishness[,] because of what was more important to him, his obsession and his other life." The prosecutor went on: "[T]his isn't a case about an adult hating a child. . . . It's just that he loved himself and his other obsession more than that little boy."

beginning that Cooper's death was simply a tragic accident, the State leaned heavily on evidence of the graphic, sexual nature of Harris's online discussions, details of his extramarital sexual relationships (past, present, and — as he appeared to hope — future), and other matters of that sort to demonstrate that, along with divorcing his wife, murdering his son was one of a series of "escalating" actions Harris took to break free from a life he increasingly did not want.[96] In this way, the State cast Cooper's death as the culminating chapter in a sordid and tragic story.

I respect the view expressed in the majority opinion that the risk of unfair prejudice associated with the evidence presented by the State to advance this theory outweighed its probative value. I simply do not share it. When considering the universe of possible motives that would cause a father to subject his child to the fate Cooper met, the overwhelming majority would reflect a depraved heart and low character. And a simple desire to have sexual

---

[96] The record suggests these actions progressed from online conversations to seeking in-person meetings, to eventually soliciting prostitutes when the earlier efforts were unsuccessful.

encounters with women does not seem like a sufficient motive to murder your own child. Thus, the State needed to show the nature, scope, and extent of Harris's sex life and desires and prove a motive a reasonable juror would accept as the basis for forming an intent to take such actions.

As the majority opinion rightly notes, with regard to whether Harris maliciously killed his child, evidence merely suggesting or indicating that Harris engaged in explicit sexual conversations online, that he cheated on his wife, and that he engaged in criminal activity involving minors in the months and years leading up to Cooper's death is not particularly strong or helpful to the State. But the details of such activity and its extent, particularly in the words Harris himself used to describe his life, his unfulfilled sexual desires, and so on, are the primary source of this evidence's value to the State's case. Each additional Whisper post, each additional demand for sex, each additional complaint about his station in life added to the portrait of Harris the State almost certainly had to paint in order to convince the jury that he would act on these desires

by murdering his son.

Of no less importance to the issues before us, with regard to each piece of evidence now at issue, the trial court ruled pursuant to Rule 403 that the probative value of such evidence to the issues in the case was not substantially outweighed by any danger of unfair prejudice from its admission. See Maj. Op. at 265. This Court owes significant deference to the trial court's determinations regarding the admission or exclusion of evidence at trial under Rule 403 and its balancing of the interests addressed by Rule 403. See *Wilson v. State*, 312 Ga. 174, 190 (2) (860 SE2d 485) (2021). We have also repeatedly recognized that "Rule 403 is an extraordinary remedy, and that in reviewing the admission of evidence under Rule 403, [courts] look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation and punctuation omitted.) Id.; see also *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017) ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative

value that the rule permits exclusion." (citation and punctuation omitted; emphasis in original)). Given the nature of the remedy afforded by Rule 403, through which a trial court can exclude relevant evidence from being presented to the jury, we have repeatedly cautioned that such remedy should be only used "sparingly." *Olds v. State*, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016). Moreover, we have also noted that "the major function of [Rule 403] is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect[.]" (Citation and punctuation omitted.) *Kirby v. State*, 304 Ga. 472, 480 (4) (819 SE2d 468) (2018). "[I]n close cases, balancing under Rule 403 should be in favor of admissibility of the evidence." *Pike v. State*, 302 Ga. 795, 801 (4) (809 SE2d 756) (2018).

Applying these highly deferential and oft-cited principles to the case before us, I see no abuse of that discretion in regard to the trial court's admission of any of the evidence at issue in this appeal under Rule 403. For instance, with regard to evidence of Harris's communications regarding sexual activities before the date of

Cooper's death, the majority opinion concludes, rather summarily, that the State's introduction of "records of *all* of the messages" between Harris and his paramours "went well beyond what was necessary to establish the context of [Harris's] relationships." (Emphasis in original.) Maj. Op. at 269. As noted above, I respectfully take a different view of this evidence and its place in the State's case. In my view, it was not enough for the State to simply establish for the jury the "context" of Harris's relationships with the women he communicated with online, id., or to establish, in general terms, "the first link" in a chain of reasoning by which Cooper's murder would advance Harris's goal of sleeping with "many women." Maj. Op. at 271. Instead, the majority opinion emphasizes that only "some amount" of the evidence of Harris's communications and activities was probative in establishing Harris's motive to kill Cooper. Maj. Op. at 273. However, with regard to evidence of his communications, for instance, the majority declines to

> decide precisely how much evidence the State should have
> been permitted to offer to support [the] initial point of its
> motive theory in order to conclude that a large amount of

146

> the evidence that was presented — especially the more prejudicial evidence of vulgar discussions — was *needlessly* cumulative and should have been excluded under Rule 403.

(Emphasis in original.) Maj. Op. at 274.

But in my view, it was the graphic, sordid details of Harris's extramarital activities and relationships and the manner in which Harris repeatedly communicated with females (including teenagers) that lent the evidence its power in this case as the State attempted to persuade the jury that Harris had attempted to clear barriers to acting on his sexual desires by, among other things, killing his child. Stated differently, the context of the relationships and activities was less damning than their *extent*. In light of that extraordinary theory, the State had a clear prosecutorial need for the evidence. See, e.g., *Worthen v. State*, 306 Ga. 600, 606 (832 SE2d 335) (2019) (explaining that the prosecutorial need for the evidence at issue was high because "[t]he evidence against Appellant, aside from the other acts evidence, . . . was far from overwhelming. In particular, without the other acts evidence, it is unclear what motive Appellant would have

147

had to engage [the victims] in the first place, much less to intentionally encourage [Appellant's co-defendant] to pull out a gun and start shooting at [the victims] in a crowded park.").

I also view the volume and detail of the evidence as being more probative than the majority apparently does, and I certainly do not view the evidence as having the extremely limited probative value that characterizes other evidence which we have determined should have been excluded under Rule 403 as a matter of law. Compare *Robinson v. State*, 308 Ga. 543, 551-552 (2) (b) (ii) (842 SE2d 54) (2020) (determining that portion of arrest video that "did not have even the remotest shred of relevance" should have been excluded by the trial court under Rule 403); *Jackson v. State*, 306 Ga. 69, 78 (2) (b) (ii) (829 SE2d 142) (2019) (noting "lack of any real prosecutorial need" as part of determination that evidence of prior shooting should have been excluded under Rule 403); *Brown v. State*, 303 Ga. 158, 162-163 (2) (810 SE2d 145) (2018) (discussing that, in light of defendant's self-defense claim, the probative value of certain other-acts evidence "was extremely low at best" and had "nothing to do

with his reason for shooting the victim" (citation and punctuation omitted)). And while some of the evidence can fairly be characterized as cumulative, I am not prepared to say, as a matter of law, that the presentation of such evidence by the State was "needless" such that it was an abuse of discretion to admit it. See Rule 403 (allowing the trial court to exclude relevant evidence based on "considerations of . . . needless presentation of cumulative evidence").

Moreover, while it is clear to me that the evidence of messages containing lewd and derogatory language was prejudicial to Harris, I do not view that evidence as being unfairly so in light of the State's theory of the case. See *Heade v. State*, 312 Ga. 19, 27 (3) (860 SE2d 509) (2021) (finding no abuse of discretion in admission of evidence under Rule 403 where "the prejudicial impact of [the evidence], while significant, was not unfair"). Nor is it fair to say that those messages were introduced by the State or valuable to the State merely for their shock value or that the average juror would be shocked by the evidence presented. See *Smith v. State*, 302 Ga. 717, 724 (3) (808 SE2d 661) (2017) (determining that trial court did not

abuse its discretion under Rule 403 by permitting the State to introduce recording of phone call containing derogatory language used by defendant and noting that "[u]nfortunate though it may be, the words that [appellant] used have lost much of their shock value in contemporary culture" (citation and punctuation omitted)).

And even though some of the evidence offered by the State, such as the enlarged copies of photographs Harris took of his erect penis and sent to various women, was vulgar and may have been of "scant probative value," *Morgan v. State*, 307 Ga. 889, 898 (3) (d) (838 SE2d 878) (2020), it is not clear to me that, even in that instance, the value of those pictures to the State's case was *substantially outweighed* by the danger of unfair prejudice and that admitting them was an abuse of discretion. Compare *Strong v. State*, 309 Ga. 295, 310-312 (2) (845 SE2d 653) (2020) (trial court abused discretion by admitting "extensive other-act evidence" under Rule 403 where State's need for evidence to prove intent was "extremely low" and probative value of evidence was "wholly outweighed by its

extreme and unfair prejudicial impact").[97]

In my view, while denying that it has done so, the majority draws, as a matter of law, an artificial and (to me) invisible line it then determines was crossed by the detailed nature of the evidence presented in this case. But the task of drawing that line in light of the needs and circumstances of a given case through "[t]he application of the Rule 403 test is a matter committed principally to the discretion of the trial courts," not this Court. *Olds*, 299 Ga. at 70 (2). Because Harris has not presented a compelling argument that the trial court's rulings under Rule 403 were beyond its considerable discretion, I would decline to reverse his convictions for the crimes

---

[97] The majority opinion notes in its footnote 71 that the State has conceded that there was no basis for admitting the enlarged photographs. I first note in response that we are not bound by the State's concession of error. "The State cannot concede error where there is none. This [C]ourt must determine for itself whether error exists." *Brown v. State*, 264 Ga. 803, 807 (450 SE2d 821) (1994) (Carley, J., concurring specially). Moreover, I am not persuaded by the opinion of the attorney for the State regarding the value and need for the enlarged photographs in relation to any unfair prejudice their presentation to the jury may have caused. As noted elsewhere, I recognize at least some prosecutorial need and probative value in such evidence in light of the State's clear need to prove Harris's motive to kill Cooper, and I do not believe the trial court abused its discretion by admitting the photographs.

against Cooper on that basis.[98]

I also part ways with the majority in Division 4 of its opinion. I agree with the majority that the question of whether evidence regarding Harris's communications with C. D. was admissible both in regard to the crimes he allegedly committed against her and in regard to crimes against Cooper is "intertwined." But for many of the same reasons stated above, I see no abuse of the trial court's discretion in denying the motion to sever.

As discussed above, the State's narrative of this case was that Harris's numerous sexual dalliances and escapades and his desire to act on ongoing sexual communications and solicitations with other women were the driving force behind his decision to kill Cooper. Evidence that some of that conduct, particularly in regard to C. D., was criminal fit neatly with the State's overall theory of its case against Harris and was, in fact, part of the State's narrative

---

[98] It seems worth noting that I do not believe the trial court would have abused its discretion by limiting or excluding this evidence had *it* determined that the balance fell the other way.

regarding Harris's motive to murder his son.[99] While it would not have been an abuse of discretion to sever the charges regarding C. D., in light of the relationship between the crimes against C. D. and those against Cooper, the trial court did not abuse its discretion by denying the motion to sever. See *Moon v. State*, 312 Ga. 31, 59 (5) (860 SE2d 519) (2021) ("[W]here the joinder is based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the sound discretion of the trial judge since the facts in each case are likely to be unique." (citation and punctuation omitted)). I likewise see no abuse of the trial court's discretion in determining that severance was unnecessary to achieve a fair determination of Harris's guilt or innocence as to each offense, even in light of the number of offenses charged and the complexity and volume of evidence presented by the

---

[99] In the prosecutor's opening statement, he noted that "on that day, while his child was cooking to death, [Harris] was also messaging a girl he met when she was 16, who was 17 at the time, still trying to get pictures of her vaginal area from her." The prosecutor also described the charges in the case as being "interrelated."

State. See id. And because I view that evidence as being admissible in regard to the charges relating to both C. D. and Cooper, I disagree with the majority opinion's conclusion that severance was required.[100] See Maj. Op. at 280-283.

The legal issues involved in this case, particularly the application of Rules 403 and 404 by trial courts and the proper review of such decisions by our Court, are sometimes among the most vexing legal questions we face in the criminal cases that come before us. These rules provide great flexibility to trial courts to assess the needs of a given case, and our opinions in this space attempt to define the scope of discretion, draw lines, and establish guideposts by which other Georgia courts can make principled and consistent rulings. Those are worthy goals for a court of last resort, particularly one that must itself regularly grapple with these issues and apply its own prior rulings on direct review.

---

[100] Because I see no error in the trial court's admission of the evidence under Rule 403 or its denial of the motion to sever, I would not reach the question of whether these alleged errors were harmless, which the majority addresses in Division 5 of its opinion.

I fear, however, that in this case, the majority has substituted its own judgment for that of the trial court without due consideration for the theory of the case the State sought to advance, the way it chose to charge and prosecute Harris, the State's need for the evidence at issue, and its probative value. The majority opinion thus suggests a larger role for this Court in reviewing decisions to admit evidence under Rule 403 than has traditionally been the case by my understanding. For those reasons and the others stated above, I respectfully dissent from Divisions 3 and 4 of the opinion of the Court and, thus, its ultimate judgment.

I am authorized to state that Justice LaGrua and Justice Colvin join in this opinion concurring in part and dissenting in part.

Decided June 22, 2022 — Reconsideration denied July 14, 2022.

Murder. Cobb Superior Court. Before Judge Clark.

*Mitchell D. Durham*, for appellant.

*Flynn D. Broady, Jr., District Attorney, Linda J. Dunikoski, Samuel R. d'Entremont, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.